COMMONWEALTH *VS.* ERASMUS ANTULIO MARTINEZ.

Suffolk. March 3, 1997. - July 11, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & MARSHALL, JJ.

*Practice, Criminal,* Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel. *Attorney at Law,* Conflict of interest. *Evidence,* Judicial discretion, Authentication of document, Prior consistent statement, Credibility of witness. *Witness,* Credibility.

A new trial was required in a murder case where defense counsel had a conflict of interest by reason of his continuing simultaneous representation of a key Commonwealth witness, and where counsel breached his confidential relationship with the defendant by communicating to the witness client that he felt the defendant was lying about his case: the colloquy in which the judge engaged the defendant, with respect to his right to have counsel free of divided loyalties, was insufficient, in the circumstances, to support the defendant's waiver of that right. [387-394]

At the retrial of a murder indictment the judge has discretion under Mass. R. Crim. P. 40 (a) (2) to admit in evidence such foreign documents as may be proffered by the defendant in unauthenticated form. [394-395]

In the circumstances of a murder trial, the judge properly admitted evidence of a witness's prior consistent statements on direct examination. [396-397]

At the retrial of a murder case, evidence of a witness's plea bargain in exchange for his truthful testimony is to be admitted with reference to the decisions of *Commonwealth* v. *Ciampa*, 406 Mass. 257, 260 (1989), and *Commonwealth* v. *Colon*, 408 Mass. 419, 445 (1990), and evidence of another witness's guilty plea is to be admitted with a limiting instruction to the effect that the guilty plea is not evidence of the defendant's guilt. [398-399]

INDICTMENTS found and returned in the Superior Court Department on May 10, 1989.

The cases were tried before *Sandra L. Hamlin,* J., and a motion for a new trial, filed on May 6, 1991, was considered by her.

*Jane A. Sullivan,* Assistant District Attorney, for the Commonwealth.

*Kenneth J. King,* Committee for Public Counsel Services, for the defendant.

FRIED, J. On October 20, 1989, a jury found the defendant, Erasmus Antulio Martinez, guilty of murder in the first degree

and possession of a "sawed-off" shotgun. The defendant appealed and filed a pro se motion for a new trial. A hearing was held in Superior Court to consider the motion and to determine whether an evidentiary hearing was needed. On October 26, 1995, the defendant's motion for a new trial was denied without an evidentiary hearing. Martinez appeals from this denial under the Sixth and Fourteenth Amendments to the United States Constitution and art. 12 to the Massachusetts Declaration of Rights. Additionally, he contends that errors pervaded his trial, thus requiring a new trial in the interests of justice under G. L. c. 278, § 33E. We reverse the convictions and order a new trial.

I

At trial, the Commonwealth presented evidence that Martinez had arranged for the murder of Ramon Guitierrez, because Guitierrez had stolen drugs or money from Martinez in connection with "a drug deal [that] had been going bad." According to the Commonwealth's case, Angel Iraola introduced Martinez to James Bey at Jilly's Bar in Chelsea on the evening of November 28, 1987. Iraola told Bey that Martinez would pay Bey $15,000 if Bey would "take care" of Guitierrez, to which Martinez indicated his agreement.

According to Bey, the threesome left the bar together and got into the defendant's pick-up truck.[1] Martinez drove to an apartment at Division Street in Chelsea, went into the building, and returned with a green plastic garbage bag which contained a sawed-off shotgun. Back in the truck, Martinez drove to the area of Essex and Congress streets and proceeded to drive around the block. Martinez gave the bag to Iraola, who removed the gun and loaded it with ammunition which, according to Bey, Martinez had also produced. At the corner of Essex and Shurtleff streets, Iraola pointed to two men and said, "there they are." Martinez stopped the truck and Iraola jumped out, pulling Bey with him and handing Bey the weapon. Bey testified that he walked toward the men, who were standing in front of a store, and fired a single shot. One of the men fell and the other began to run. Instructed by Iraola to shoot again, Bey approached the man who was lying on the sidewalk and fired a second shot. Bey returned to the truck, at

---

[1]Bey was the only witness to provide a full account of events on the night the murder took place. Iraola had pleaded guilty to manslaughter. When he was called as a witness by Martinez, Iraola invoked his Fifth Amendment privilege and refused to testify.

which time Martinez sped away and Iraola informed Bey that he had shot the wrong person. The victim, Ruben Pazcel, died of multiple shotgun wounds early on the morning of November 29, 1987.

At his trial, Martinez testified that he and his wife had left Chelsea on November 24, 1987, several days before the killing, and that he had remained out of state until July 10, 1988. One defense witness testified that she had been invited to a farewell party for Martinez and his wife on November 23, 1987, and another witness testified that she had attended this party at which the defendant's wife told her they were leaving on a trip. Martinez submitted evidence consisting of a document he claimed was his Guatemalan passport and an international border paper which purported to show that he had crossed into Mexico from Texas in his Toyota pick-up truck on November 27, 1987, the day before the shooting. Other forms of documentary evidence, which had not been obtained at the time of the trial, reinforcing this alibi were submitted in .support of the defendant's motion for a new trial.

Martinez appeals on a number of grounds: (1) he was deprived of his right to conflict-free counsel because his attorney, Jose Espinosa, had represented one of the prosecution witnesses in other matters; (2) he was denied a fair trial because there was not sufficient disclosure of a critical plea bargain involving one of the witnesses for the prosecution; (3) the documents presented at his motion for a new trial provide a sufficient basis for ordering a new trial; (4) he was deprived of a fair trial due to the admission of a prosecution witness's prior consistent statements before that witness's credibility had been impeached; (5) the prosecutor impermissibly vouched for the credibility of a Commonwealth witness; (6) the prosecutor's closing argument was improper; and (7) he was denied effective assistance of counsel. He also seeks relief under G. L. c. 278, § 33E. As we conclude that. Martinez is correct as to the first ·contention, we address only that issue and those issues likely to arise in a retrial.

## II

At Martinez's trial, prosecution witness Ramon Rosario testified that he had seen Martinez, whom he knew as "Tulio," accompanied by Bey and Iraola, driving his truck on Shurtleff Street just prior to the shooting. Rosario lived at the corner of Shurtleff and Congress Streets and had been attempting to back

his car on to the street when he barely avoided a collision with a station wagon. Rosario left his car to argue with the driver of the station wagon. He then tried to follow the station wagon for a few minutes but then parked and returned to his house. A short time later, while on the porch of his house, he heard shooting and saw a blue truck heading down Shurtleff toward Congress Street. He could not say whether this truck was the same truck in which he had seen Martinez prior to the shooting.

Martinez claims this testimony was critical because Rosario was the only prosecution witness besides Bey to place the defendant and his blue truck in Chelsea on the day in question and near the scene of the murder. He was also the only witness who testified to his firsthand knowledge that the defendant engaged in selling drugs — a point which was material to the prosecution's theory regarding motive. The defendant points out that in the days following the shooting, Rosario was interviewed several times by the police and never mentioned seeing the defendant. At Martinez's request, Jose Espinosa, his trial attorney, listed Rosario as a potential defense witness. It was this mention which prompted the Commonwealth to investigate Rosario again. In an interview conducted by police just prior to the trial and reported to the prosecutor on the day of jury empanelment, two years after the event, Rosario said he had seen the defendant, Bey, and Iraola in the defendant's truck which was behind the station wagon when Rosario was involved in his near-miss traffic altercation. He was subsequently called as a witness for the Commonwealth.

Prior to the trial, Rosario had been involved in a series of criminal matters in which Espinosa had served as his attorney. The defendant argues that this representation continued before, during, and after the trial, while the Commonwealth insists that Espinosa's representation of Rosario had effectively ended a number of months prior to the trial. The defendant contends that this dual representation impeded Espinosa's cross-examination of Rosario and suggests that it also led to a breach of client confidence which may have influenced Rosario's incriminating statements.

It was not until the fifth day of trial, just before Rosario was to testify, that Espinosa and the judge discussed his relationship with Rosario. Espinosa began his representation of Rosario on a series of drug-related charges in March, 1988. He was appointed to

represent the defendant in September, 1988. In January, 1989, Espinosa received a discovery package for Martinez's case which included an interview with Rosario. Once he confirmed that this interview was with the same Rosario whom he represented, Espinosa informed the defendant that he was Rosario's attorney in some unrelated matters. Espinosa was not aware that Rosario would be testifying for the Commonwealth until he received a transcript of one of the later Rosario interviews in which he identified Martinez as being near the murder scene. Espinosa then spoke with Rosario at the Deer Island house of correction. Defense counsel assured the judge that he had kept the defendant apprised of all interactions with Rosario, and that the defendant had "never expressed any problem" about this, but Espinosa admitted that Rosario's "position ha[d] changed somewhat from when I first spoke with him."

Espinosa told the judge that his representation of Rosario had "effectively ended in April of this year [1989] when we wrapped up a package with the Boston Municipal Court as to all his cases," although he conceded that he was "technically still representing him on" one last case, involving a charge of disorderly conduct, in Chelsea that was supposed to be "part of the package" already arranged.[2] Espinosa told the judge that he had "no problems cross-examining Mr. Rosario whatsoever." Reviewing this potential conflict on the defendant's motion for a new trial, the trial judge determined that "[t]hrough administrative oversight [this] one case was not docketed as disposed of until a subsequent time. The intent was to dispose of that case along with the others." The judge then concluded that Espinosa was not simultaneously representing both the defendant and Rosario and that there was no conflict.

[2] Apparently Rosario had accumulated approximately twenty-four different charges against him in Chelsea, one of which was not transferred to the Boston Municipal Court jury session with the others. Espinosa stated that his "understanding was that that case would also be part of the package deal that we worked out."

The outstanding charge was a complaint which accused Rosario of disorderly conduct. It was resolved on June 19, 1991, at which time Rosario admitted to a number of facts and was sentenced to ten days at a house of correction. This sentence was to run concurrently with a two and one-half year suspended sentence imposed on one of the charges addressed in April, 1989. At the time Rosario received the ten-day sentence, his probation as to the other charge was revoked and he was ordered to serve the two and one-half year sentence.

Nonetheless, the judge sought to preserve the defendant's consent to Espinosa's services on the record. Espinosa was instructed to repeat the facts surrounding both his representation of the defendant and of Rosario. The judge then asked the defendant if he had listened to what had been said. When Martinez responded affirmatively, the judge asked if he still wanted Espinosa to represent him and Martinez said, "Yes."[3] In denying Martinez's subsequent motion for a new trial, this trial judge noted that "extensive prior conversations were held regarding the conflict issue between counsel and the defendant," "[t]he defendant had ample time to thoughtfully consider his position," and "defendant had complete knowledge of his rights to a conflict-free attorney and the circumstances concerning his lawyer's prior representation of Rosario," thus resulting in a decision to continue that was knowing, intelligent, and voluntary.

The Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights entitle a defendant to the effective assistance of counsel. *Commonwealth* v. *Hodge*, 386 Mass. 165 (1982). Because the assistance of legal "[c]ounsel is

---

[3]The actual discussion, which took place with the assistance of an interpreter, as the defendant could not speak or read English, occurred as follows:

THE JUDGE:        "Would you state your name, please, sir?"

THE DEFENDANT:    "Erasmus Antulio Martinez."

THE JUDGE:        "Did you listen to what Mr. Espinosa said to me?"

THE DEFENDANT:    "Yes."

THE JUDGE:        "And you discussed the matter with him of his representing you?"

THE DEFENDANT:    "Yes."

THE JUDGE:        "Based on what's been said — you heard what the district attorney said. Did you listen to that, as well?"

THE DEFENDANT:    "Yes."

THE JUDGE:        "Do you wish Mr. Espinosa to represent you, in other words, to be your lawyer? Do you want him to continue being your lawyer?"

THE DEFENDANT:    "Yes."

THE JUDGE:        "All right. You may sit down."

vital to the adversary process," *Commonwealth* v. *Connor*, 381
Mass. 500, 503 (1980), we have repeatedly insisted that this
means "[a] defendant is entitled to the untrammeled and
unimpaired assistance of counsel free of any conflict of interest
and unrestrained by commitments to others." *Commonwealth* v.
*Michel*, 381 Mass. 447, 453 (1980), quoting *Commonwealth* v.
*Davis*, 376 Mass. 777, 780-781 (1978). *Commonwealth* v. *Fog-
arty*, 419 Mass. 456, 458 (1995). *Commonwealth* v. *Smith*, 362
Mass. 782, 783 (1973). It is for this reason that we have held
that art. 12 does not require a defendant to demonstrate
prejudice, once a genuine conflict has been shown. *Com-
monwealth* v. *Hodge, supra* at 167-168. *Commonwealth* v.
*Davis, supra* at 781. This is a lighter burden than that entailed
by the Sixth Amendment, which requires a showing that the
conflict had an adverse impact on the defendant. *Cuyler* v. *Sul-
livan*, 446 U.S. 335 (1980). We have chosen this more protec-
tive course to avoid putting a defendant in the untenable posi-
tion where he would otherwise

> "be put to the burden, perhaps insuperable, of probing the
> resolve and the possible mental conflict of counsel. Both
> the potential for [adverse effect on counsel's performance]
> and the difficulty of proving it are apparent, particularly as
> to things that may have been left not said or not done by
> counsel."

*Commonwealth* v. *Hodge, supra* at 169-170, quoting *Com-
monwealth* v. *Cobb*, 379 Mass. 456, 461, vacated sub nom.
*Massachusetts* v. *Hurley*, 449 U.S. 809 (1980), appeal dismissed,
382 Mass. 690 (1981).

In the extended lobby conference which took place on the
fifth day of trial, the judge determined that there was no
conflict of interest. We review this case under G. L. c. 278,
§ 33E, which "consigns the facts as well as the law to our
consideration, gives us the power and the duty exercised by
a trial judge upon a motion for a new trial, and requires us
to consider the whole case broadly." *Commonwealth* v. *Ger-
away*, 364 Mass. 168, 175 (1973), quoting *Commonwealth*
v. *Cox*, 327 Mass. 609, 614 (1951). Whether or not the
charge on which Rosario had yet to be sentenced was meant
to be part of the previously negotiated April "package," Es-
pinosa still bore some responsibility for his client's fate and
was therefore still burdened with a duty of loyalty to a
prosecution witness. This is not a case in which the defense

attorney's relationship with a prosecution witness had clearly ended before trial, obviating the risk of simultaneous representation. Compare *Commonwealth* v. *Fogarty, supra* at 459 (attorney-client relationship with witness ended ten months prior to retainer by defendant); *Commonwealth* v. *Smith, supra* at 783 (representation of witness ended day before trial). On the contrary, when Espinosa asked Rosario whether he had "stopped being your lawyer sometime in April of this year," Rosario responded, "No, sir." Sentencing for the disorderly conduct charge on which Espinosa still represented Rosario did not take place until sometime in June, 1991, at which time Rosario pleaded guilty.[4]

While this charge of disorderly conduct and its resultant concurrent ten-day sentence would, in another context, appear a small matter on which to base a conflict of interest, in the circumstances of this case it is sufficient to raise genuine concerns that Martinez was denied the undivided loyalty of his attorney. While we do not automatically infer a conflict from dual representation, *Commonwealth* v. *Walter*, 396 Mass. 549, 554 (1986); *Commonwealth* v. *Soffen*, 377 Mass. 433, 438 (1979), and we require a defendant to present "adequate evidence of its existence . . . detailing the precise character of the alleged conflict," *Commonwealth* v. *Davis, supra* at 781; *Commonwealth* v. *Soffen, supra* at 437, a conflict exists "whenever there is tension between the interests of one client of an attorney and those of another." *Commonwealth* v. *Michel, supra* at 451; *Commonwealth* v. *Pires*, 389 Mass. 657, 661 (1983). When an attorney simultaneously represents a criminal defendant and a prosecution witness, there is the potential for a serious conflict of interests. *Commonwealth* v. *Walter, supra* at 555.

At the time of Martinez's trial, Espinosa was being investigated by the Board of Bar Overseers for ethical violations, and within one month of the trial, a single justice of this court limited Espinosa's practice to criminal matters.[5] In these circumstances, Espinosa "was potentially inhibited from cross-examining [Ro-

---

[4]By June, 1991, Espinosa had resigned from the bar due to charges of ethical misconduct he was facing, see note 5, *infra*. There is no evidence that he actually represented Rosario when Rosario eventually pleaded guilty on the remaining charge. Espinosa was, however, under an obligation to represent Rosario on this matter in 1989, at the time of Martinez's trial.

[5]Among other things, Espinosa faced charges that he had paid inmates referral fees to find clients for him. In an affidavit in which he admitted to misrepresenting the status of cases to clients, mishandling client funds, incurring

sario] in a way that would embarrass or offend him . . . especially in a way that could incriminate him." *Commonwealth* v. *Cobb, supra* at 461, and cases cited. See *Commonwealth* v. *Hodge, supra* at 168 (defense attorney had "financial interest in not antagonizing" witness who was client of his firm).[6] Indeed, Espinosa's continued concern for Rosario was evidenced by the concern he expressed to the court that Rosario would not face prosecution for any references to drug transactions which he might make while testifying.[7] See *Commonwealth* v. *Pires, supra* at 661 (actual conflict exists when "attorney cannot use his best efforts to exonerate one defendant for fear of implicating another"). We have held that a genuine conflict of interest can be shown by reference to the trial record or through extrinsic evidence which may have been "obscured from the court before and during trial," recognizing that "economic or personal constraints generated from outside may be as damaging to a defendant as anything reported in the trial transcript." *Commonwealth* v. *Davis, supra* at 781.[8]

substantial financial obligations, and failing to respond to requests by bar counsel, Espinosa resigned from the bar in December, 1990.

[6]The Commonwealth accuses the defendant of engaging in speculation as to the existence of any financial interest in respect to Rosario at the time of the trial. While there is no evidence that Rosario owed Espinosa money for representation on the charge on which Rosario was yet to be sentenced, it is apparent that Espinosa had been representing Rosario on a number of matters over the past year, and that this representation had not come to a clear conclusion.

[7]While not dispositive on the issue as to whether Espinosa still represented Rosario at the time of Martinez's trial, in examining the ambiguous relationship between the two we note that Espinosa continued to meet with Rosario on various matters in which he represented Rosario throughout the time he was preparing Martinez's case for trial. Additionally, Rosario retained Espinosa to represent him in a number of other matters following Martinez's trial in December, 1989, and May and July, 1990. While a contract for representation entered into *after* a trial would not normally raise questions regarding a conflict of interest at the time of the trial, in the circumstances of this case, it heightens our concern whether the attorney-client relationship between Espinosa and Rosario ever ended at all.

[8]During their lobby conference, Espinosa and the judge placed great emphasis on the fact that the matters on which Espinosa represented Rosario were completely unrelated to the murder charge in which he represented Martinez. While this may be true, this is not the question we ask when we consider whether an attorney's loyalty to one client may be diluted by his obligations to another. See *Commonwealth* v. *Cobb*, 379 Mass. 456, 459 (1980) (conflict found where defense attorney represented prosecution witness in unrelated matters before, during, and after the defendant's trial and conviction); *Commonwealth* v.

Our concerns regarding Espinosa's loyalties are made acute by the defendant's allegations that Espinosa breached his confidential relationship with the defendant by telling Rosario that he did not believe Martinez's alibi. In a side-bar conference which took place during a discussion and a colloquy on Espinosa's potential conflicts of interest, the prosecutor showed the judge a police report which had been prepared on October 2, 1989, from statements made by Rosario in which Rosario claimed, "that when [Espinosa] came out to Deer Island . . . and asked him questions relative to the shooting, Espinosa stated to Rosario that he felt Martinez was lying to him about the shooting." Espinosa did not deny this report but replied, "I reviewed that. My client knows about it, your Honor. I have not withheld any information from my client. . . . I have not withheld any evidence from my client. This is his case, and he is entitled to the good as well as the bad."[9] The constitutional guarantee to effective assistance of counsel, untroubled by conflicts of interest, is intended not only to prevent the problems that can spring from contemporaneous divided loyalties, but also to prevent prejudice to a defendant arising from an attorney's treatment of privileged information. And, of course, Espinosa's impressions about the truthfulness of his client are as much part of the privileged information as what Martinez had actually said to him.[10] See, e.g., *Commonwealth* v.

*Hodge,* 386 Mass. 165, 165 (1982) (defendant denied effective assistance of counsel when his attorney's partner represented a prosecution witness in an unrelated civil matter).

[9]Although Espinosa did not explicitly admit he had breached Martinez's confidence, Espinosa's unusual response, in which he did not deny such allegations, refutes the judge's conclusion on the defendant's motion for a new trial that "[t]here is no factual support for defendant's allegation that defense counsel 'told Rosario that he did not believe defendant told him the truth about the murder.' "

[10]Observing that this discussion between Espinosa and Rosario would have taken place before Rosario came forward with his statement which placed Martinez near the murder scene, the defendant suggests that Espinosa's breach of client confidentiality led directly to the incriminating observations Rosario subsequently reported to the police. Additionally, or alternatively, the defendant argues that Espinosa's improper disclosure "emboldened" Rosario when he testified, as he could assume he would not be confronted by a vigorous cross-examination. Rosario's own explanation for his delay in coming forward with this information was that, in all the times he had been questioned about the events of November 29, 1987, no one, including Espinosa, had ever asked him whether he had seen Martinez that night. While this oversight may itself raise questions regarding Espinosa's preparation for this case, we are not inclined to

*Soffen, supra* at 437-438; S.J.C. Rule 3:07, Canon 4, DR 4-101 (B), as amended, 382 Mass. 778 (1981). Such a disclosure regarding Martinez's credibility was directly relevant to the case in which Rosario would be testifying. Taking into account Espinosa's relationship with Rosario, Espinosa's ethical problems, and the undenied allegations of broken client confidence, all in the context of our responsibilities of review under G. L. c. 278, § 33E, the defendant's claim of a conflict of interest "is supported by adequate evidence of its existence." *Commonwealth* v. *Davis, supra* at 781. See *Commonwealth* v. *Geraway, supra* at 174 (new trial ordered in § 33E case even though various conflicting attorney-client relationships presented defendant with "slight, if any, possibility of prejudice").

When a genuine conflict exists, a defendant may consent to continued representation by his attorney "so long as his consent is voluntarily, knowingly, and intelligently made." *Commonwealth* v. *Goldman*, 395 Mass. 495, 498, cert. denied, 474 U.S. 906 (1985). Because "[c]ounsel's undivided loyalty to the client is crucial to the integrity of the entire adversary system," *id.* at 508, this waiver by the defendant must be clear and unambiguous. *Id.* at 507-508. In order to ensure that such a waiver is obtained, we have imposed "an affirmative duty [on the trial court] to assure that [a] defendant is adequately informed of the risks and potential dangers" that can arise as a result of an attorney's divided loyalties and "acknowledges an understanding of this information" on the record. *Commonwealth* v. *Davis, supra* at 784-785; *Commonwealth* v. *Connor, supra* at 506. Arguing that there was no conflict in the first place, the Commonwealth portrays the judge's colloquy with Martinez as a measure taken "out of an abundance of caution." As we hold that a conflict did exist, however, the colloquy between Martinez and

join the defendant in his conclusion that Espinosa's breach of confidence led directly to Rosario's damaging testimony. Instead, we simply acknowledge this allegation of improper disclosure, which Espinosa did not deny, as additional evidence that Espinosa's loyalty to Martinez was compromised by his relationship with Rosario.

Similarly, we are not willing to concur with the defendant in faulting Espinosa for not questioning Rosario regarding his own involvement in the murder. Such a theory is unnecessary to our determination that a conflict existed and there was no evidence to support the defendant's far-fetched suggestion that Rosario may had been involved in the crime himself.

the judge was required. *Commonwealth* v. *Walter, supra* at 559. Compare *Commonwealth* v. *Pavao*, 423 Mass. 798, 801-804 (1996).

While we have not prescribed a set form for this exchange, *Commonwealth* v. *Davis, supra* at 785, the discussion which took place in this trial, see note 3, *supra*, was inadequate. Cf. *Commonwealth* v. *Jones*, 403 Mass. 279, 281-283 n.2 (1988); *Commonwealth* v. *Connor, supra* at 505; *Commonwealth* v. *Desfonds*, 32 Mass. App. Ct. 311, 314-315 n.3 (1992). The judge did give both Espinosa and the prosecutor an opportunity to discuss the events that might raise a potential conflict of interests from their perspectives, and asked the defendant whether he had listened to their remarks. Nowhere in this exchange, however, did the judge inform the defendant that he had a constitutional right to an attorney who was free of divided loyalties. The judge did not give the defendant an opportunity to raise or discuss any concerns that he might have and did not make sure that the defendant understood that other counsel could be retained in his behalf. *Commonwealth* v. *Goldman, supra* at 507-508; *Commonwealth* v. *Davis, supra* at 785. The colloquy included no discussion of Espinosa's alleged disclosure to Rosario, a key prosecution witness, that he disbelieved his own client, the defendant.[11] The judge did ask Espinosa whether "in [his] own mind" he felt that he would be hampered in cross-examining Rosario, but beyond this inquiry, to which Espinosa said he perceived no problems, there is no indication on the record that Martinez was informed of his rights or provided instruction which would allow him to understand or appreciate the possible implications of Espinosa's relationship with Rosario. See *Commonwealth* v. *Hodge, supra* at 167, 170 (defendant "must have understood and appreciated that it might be to his best interests that [the witness's] credibility be vigorously attacked, and that his counsel's enthusiasm for doing so might naturally be diminished"); *Commonwealth* v. *Michel, supra* at 457 (defendant must have "awareness of the relevant circumstances and likely consequences").

---

[11]The sidebar referred to above does not cure this defect, as the defendant was not a party to that discussion. Certainly Espinosa's statement, out of the defendant's hearing, that Espinosa had "reviewed" this crucial matter with the defendant is an insufficient substitute for the judge's own inquiry of the defendant.

The prosecutor made several efforts to alert the judge to potential problems which might hinder Espinosa in his representation of Martinez. Nevertheless, we conclude that there was a conflict in this case where defense counsel is alleged to have told one client, a key prosecution witness whom he would cross-examine at trial, that he disbelieved his other client, the defendant on trial for murder. In this special context, the colloquy to procure the defendant's waiver was insufficient. As a result, we order a new trial. We now turn to the additional claims Martinez raises which may arise again in the context of a new trial.

## III

### A

*Foreign documents.* As part of his motion for a new trial, the defendant presented new documentary evidence to support his alibi, and claimed that such documentation raised a substantial issue entitling him to an evidentiary hearing, if it was not sufficient to mandate a new trial outright.[12] The judge dismissed this evidence, stating that the documents were not admissible

---

[12]At trial, the defendant's alibi was supported by several documents, all of which were challenged as to their authenticity. The prosecution pointed out that while Martinez's passport bore a Mexican stamp showing that he had left the United States, it bore no stamp indicating his reentry, and, in response to the defendant's motion for a new trial, submitted a report indicating that the passport bore some signs of tampering. A travel permit, introduced by the Commonwealth, which purported to show that the defendant had brought his truck into Mexico at Nuevo Laredo on November 27, 1987, bore the signature "S. Martinez," in a hand which the defendant admitted was not his own — later claiming that it had been signed by his wife. Another piece of evidence consisted of a Mexican border entry document which had been obtained by an off-duty Haverhill police officer, Virgil Perez, who was given $3,000 by Martinez's wife to travel to Nuevo Laredo to obtain documentation to support Martinez's defense. On cross-examination, Perez admitted that he had told two police officers that in Mexico "you can get anything you want; all you need is a stack of money," and that he had made no attempts to obtain Martinez's documentation by mail. This cross-examination ended when Perez was asked if he had ever brought a relative into the country with a phony passport. Thereafter, a voir dire was held, for which an attorney was obtained for Perez, where Perez consistently claimed his rights under the Fifth Amendment and art. 12 in response to each question, even those which he had previously answered before the jury.

The new documentation consisted of one document from the Mexican Consulate stating that Martinez's entry into Mexico through Nuevo Laredo on November 27, 1987, was registered in the files of the Mexican Immigration

because they did not meet the authentication procedure of Mass. R. Crim. P. 40 (a) (2), 378 Mass. 842, 917-918 (1979), which sets forth a double certification process in which the record is first "attested by a person authorized to make the attestation," and is then accompanied by a certificate which vouches for the document's authenticity by substantiating (1) the genuineness of the attesting signature, and (2) the official position of the signer. The judge went on to say that while the rule allowed her "discretion in admitting unauthenticated foreign documents, the court chooses not to exercise this discretion in this case because the documents are suspect," referring to testimony at trial that the defendant had manufactured his alibi and the testimony of a prosecution witness who said she had served Martinez at a Chelsea restaurant near the date of the murder.[13] The judge found that the evidence Martinez presented was "contingent on issues of credibility," *Commonwealth* v. *Vaughn*, 23 Mass. App. Ct. 40, 41 (1986), citing *Commonwealth* v. *Woods*, 382 Mass. 1 (1980), and was therefore insufficient to warrant a new trial or require an evidentiary hearing. The admissibility of this documentary evidence will need to be determined in the new trial. Rule 40 (a) (2) gives the judge discretion to admit foreign documents without final certification when there is "good cause shown" and "reasonable opportunity . . . to investigate the authenticity and accuracy of the documents."

---

Services; a letter bearing the seal of the Department of Immigration of Guatemala which attached a document indicating that Martinez had entered Guatemala on December 1, 1987; and a letter from the Guatemalan Consulate, signed by Guatemala's Consul General in New York, translating an enclosed document bearing the signature "E. Martinez" which indicated that the defendant had entered Guatemala on November 30, 1987, with his truck. These documents were accompanied by the affidavit of Steven Carey, an inmate clerk and paralegal who worked in the law library at Massachusetts Correctional Institute at Norfolk, who explained how he had met Martinez following Martinez's conviction, and had assisted Martinez by drafting letters to various governmental offices in order to obtain documentation as to Martinez's whereabouts in November, 1987.

[13]In her decision, the judge refers to a witness who "testified that she saw defendant in Chelsea two days *after* the murder" (emphasis supplied). The witness cited is Rosalba Medina who actually testified that she saw Martinez at the restaurant where she worked on November 26, 1987, two days *before* the murder. Nonetheless, this testimony would undermine faith in the genuineness of the documents as Martinez claimed that he had left Chelsea on November 24, 1987.

B

*Prior consistent statements.* Although no objection was made at trial, Martinez now objects to the introduction of prior consistent statements made by Bey which were elicited on direct examination, prior to any impeachment by the defense. On direct examination, the prosecution elicited a number of prior inconsistent statements that Bey had made following his arrest, in which he sought to deflect any blame from himself.[14] The defendant's complaint focuses on Bey's testimony in which he recounts his own earlier statement to Gerald Godin, a guard at the Charles Street Jail whom Bey had known since childhood, which was consistent with the version of the events Bey recounted at trial and which implicated both Martinez and himself. On direct examination, Bey stated that it was his realization that Godin would be testifying against him at his own trial that convinced him to accept the Commonwealth's offer to allow a guilty plea to second degree murder and possession of the shotgun.

"[A] witness's prior consistent statement is inadmissible, even where a prior inconsistent statement of the witness has been admitted." *Commonwealth* v. *Zukoski*, 370 Mass. 23, 26 (1976). There is an exception, however, if the witness's in-court testimony is impeached by a claim of recent contrivance or inducement, *id.* at 26-27; *Commonwealth* v. *Sullivan*, 410 Mass. 521, 527 (1991); *Commonwealth* v. *Binienda*, 20 Mass. App. Ct. 756, 758 (1985), if the prior statements were made before the witness had an incentive to fabricate testimony. *Commonwealth* v. *Brookins*, 416 Mass. 97, 103 (1993); *Commonwealth* v. *Binienda*, *supra* at 759. Even then, these statements are admissible only to rebut the claim of recent fabrication, not to prove the truth of the matter. *Commonwealth* v. *Zukoski*, *supra* at 27; *Commonwealth* v. *Darden*, 5 Mass. App. Ct. 522, 528 (1977).

At the time Bey confessed his involvement to Godin, he had

[14]Initially, Bey told Chelsea police Sergeant Garvin that he had been in Lawrence the night the murder took place, later claiming he had been in Boston. He then told the police that "two white guys did it," soon after changing his story to say that the murder had probably been committed by Tulio, meaning Martinez, and a fabricated Colombian character named Ramon Lopez. At his arraignment, Bey spoke to Garvin again, stating that he had been with Tulio and Lopez when the incident occurred but that Tulio had done the shooting. Bey described these statements as "fake" and "lies" but explained that he had been scared of going to prison and had been trying to cover for Iraola, believing that Martinez had already left the country.

entered no agreements with the Commonwealth and, having denied personal responsibility for the murder, Bey had no incentive to implicate himself. See *Commonwealth* v. *Sullivan, supra* at 527; *Commonwealth* v. *Andrews,* 403 Mass. 441, 454 (1988). Thus the only basis for objecting to the statement's admissibility relates to the point in this trial at which it was admitted, as the prosecution elicited Bey's prior consistent statement before the defense had had a chance to impeach Bey on cross-examination and to suggest that his testimony incriminating Martinez was a recent contrivance.[15] Nevertheless we grant trial judges "wide discretion in deciding whether the circumstances warrant the admission of a witness's prior consistent statements when he has been *or will be impeached* with an inconsistent statement" (emphasis supplied). *Commonwealth* v. *Saarela,* 376 Mass. 720, 723 (1978). As Bey had made a number of inconsistent statements in the past and had subsequently entered a plea agreement with the Commonwealth, a claim of recent contrivance would have been unavoidable or "inevitable," as the motion judge found.[16] *Id.* Such statements are admissible and the judge has "broad discretion ·. . . to decide the order in which proof will be presented." *Id.*

---

[15]The customary order would have Bey testifying as to his final version of the events of November 28, 1987, the defense raising his numerous inconsistent statements on cross-examination, and the prosecution seeking to introduce Bey's prior consistent statement to Godin on redirect examination. See *Commonwealth* v. *Saarela,* 376 Mass. 720, 722-723 (1978). Of course, because the prosecution chose to introduce Bey's prior inconsistent statements itself, this usual order was already disrupted. Nonetheless, it is clear that the defense used cross-examination to focus on the fact that Bey had a history of telling lies about this case.

[16]The defendant contends that there was no indication that the defense would seek to impeach Bey "as a person who testified to gain leniency" or suggest that he had "fabricated [his] testimony in response to an offer or inducement." Nevertheless, the defense sought to emphasize the fact that Bey had "lied throughout his many statements to the police," to suggest that this testimony was just the most recent of a long line of fabrications. The judge surely could have concluded that this line of questioning contained the implicit suggestion that Bey had chosen to implicate himself as a result of the plea bargain. *Commonwealth* v. *Andrews,* 403 Mass. 441, 455 (1988). *Commonwealth* v. *Saarela,* 376 Mass. 720, 722-723 (1978). *Commonwealth* v. *Darden,* 5 Mass. App. Ct. 522, 528 (1977). "The trial judge has a range of discretion in determining whether a suggestion of recent contrivance exists in the circumstances." *Commonwealth* v. *Zukoski,* 370 Mass. 23, 27 (1976). *Commonwealth* v. *Andrews, supra.*

## IV

The defendant claims that his trial was tainted by improper vouching for witness credibility. He made no objection on this score at his trial. He notes several instances in which the prosecutor elicited testimony from Bey and Sergeant Garvin to demonstrate that Bey had been allowed to enter his plea bargain in exchange for his *truthful* testimony, and another point in direct examination at which the prosecutor read the Commonwealth's agreement with Rosario which said it was conditioned on "truthful testimony." We have stated before that the use of

> "such a plea agreement does not constitute improper prosecutorial vouching for a witness. Such an agreement does, however, present the possibility that the jury will believe that the witness is telling the truth, thinking that, because of the agreement's truthfulness requirement, the Commonwealth knows or can discover whether the witness is telling the truth."

*Commonwealth* v. *Ciampa*, 406 Mass. 257, 260 (1989). *Ciampa* provided trial judges with advice for handling such plea bargains, suggesting that "[a]ny attempt at bolstering the witness by questions concerning his obligation to tell the truth should await redirect examination," *id* at 264, and that actual agreements should not be read at trial until prejudicial and irrelevant portions have been redacted, *id.* at 262, and should only be used on redirect. *Id.* at 264. *Ciampa* was decided after Martinez's trial had concluded and we stated that it applied only to trials in the future. *Id.* While we caution trial courts on the use of such agreements, we have accepted the general proposition that a prosecutor may use direct examination "properly [to] bring out the fact that the witness has entered into a plea agreement and that the witness generally understands his obligations under it," *id.*, remembering that "repeated self-serving references to the witness's obligation to testify truthfully," *Commonwealth* v. *Colon*, 408 Mass. 419, 445 (1990), are improper.

Of more serious concern is the introduction of testimony that Bey had pleaded guilty to the murder and that this plea had provided probable cause to obtain a warrant for the arrest of Iraola, without a cautionary instruction that Bey's guilty plea was not evidence of Martinez's guilt. While no such instruction was

requested, such evidence must be handled carefully as a plea of guilty by one person is not admissible to prove the guilt of another and may be highly prejudicial. *Commonwealth* v. *Powell*, 40 Mass. App. Ct. 430, 436 (1996).

The judgments are reversed, the verdicts set aside, and the case is remanded to the Superior Court for retrial.

*So ordered.*