## Commonwealth *vs.* Gary Gaudette.

No. 98-P-2109.

Hampden. October 11, 2001. - November 21, 2002.

Present: Perretta, Kaplan, & Beck, JJ.

*Assault by Means of a Dangerous Weapon. Firearms. Dangerous Weapon. Evidence,* Prior consistent statement. *Practice, Criminal,* Argument by prosecutor, New trial, Assistance of counsel. *Attorney at Law,* Conflict of interest.

At the trial of indictments charging assault by means of a dangerous weapon, the judge correctly ruled that the statements made by the defendant's son to a friend prior to the defendant's arrest, but after the shooting in question, were not admissible as prior consistent statements, where the defendant failed to demonstrate that the statements in question were made before the son had a motive to fabricate, given the son's knowledge of the events of the day of his father's arrest, and given the son's relationship with his father. [498-500]

Even if a comment by the prosecutor in his closing argument at a criminal trial improperly impugned the defendant's character, the comment did not warrant reversal of the defendant's conviction, given the evidence in the case, including the victim's identification of the defendant, and the instructions that judge gave the jury regarding not being swayed by sympathy, emotion, or concern about the effect or consequences of their decision; likewise, the prosecutor's statement regarding a doll with a bullet hole through its head and his display of the doll were dramatic, but the prosecutor's argument was not unduly prejudicial or otherwise improper, and other comments made by the prosecutor were merely enthusiastic rhetoric, strong advocacy, and excusable hyperbole. [500-502]

The judge at a criminal trial did not err in denying the defendant's motion for a new trial and his request for an evidentiary hearing on that motion, both of which were based on the alleged ineffective assistance of trial counsel, where the trial counsel's failure to call a witness whose testimony would have been merely cumulative did not amount to incompetency, and where the trial counsel's effectiveness at trial was not compromised by a conflict of interest, in that any testimony trial counsel could have provided concerning the defendant's son's admission of guilt to the crime for which the defendant stood trial would have been inadmissible hearsay. [502-505]

Indictments found and returned in the Superior Court Department on August 23, 1995.

The cases were tried before *Constance M. Sweeney*, J., and a motion for a new trial, filed on March 22, 1999, was heard by her.

*David G. Mintz* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from his convictions on indictments charging him with six counts of assault by means of a dangerous weapon, G. L. c. 265, § 15B(*b*), and discharging a firearm within 500 feet of a dwelling, G. L. c. 269, § 12E, the defendant claims error in the judge's exclusion of a prior consistent statement from evidence and in the prosecutor's closing argument. He also appeals from the denial of his motion for a new trial which was based upon claims of the ineffective assistance of his trial attorney (defense counsel).[1] We affirm.

1. *The evidence.* There was only one real question before the jury at trial; that is, was it the defendant or his son who committed the crimes in issue. We recite the relevant evidence.

a. *the Commonwealth's case.* Mark Sbalbi (Sbalbi) was acquainted with the defendant. He often rode dirt bikes with the defendant's teenage son, Gary, Jr. (Gary).[2] On the afternoon of July 6, 1995, Gary went to Sbalbi's house to retrieve a helmet that he had left there earlier. Because Sbalbi and his wife had guests at that time, he told Gary that someone else had borrowed the helmet and summarily dismissed him. Angered by Sbalbi's attitude, Gary told Sbalbi that he wanted the return of his helmet and stomped off. Shortly after leaving the Sbalbi residence, Gary met Sbalbi's eleven year old son, Mark, in a nearby parking lot. Gary took Mark's bicycle and told him that he would get it back when Gary's helmet was returned. Upset, Mark returned home on Gary's bicycle and told his father what had happened. Sbalbi became furious and drove through his neighborhood looking for Gary. Sbalbi found him, his girlfriend,

---

[1]The defendant's first trial ended in a mistrial. Two weeks thereafter, he again stood trial on the indictments. References throughout this opinion to "defense counsel" are to the defendant's attorney at his trial and retrial.

[2]Gary, Jr., was fifteen years of age at the time of the incident in issue. To avoid any confusion, we refer to him as Gary and to his father as the defendant throughout this opinion.

and his friend, Danny Sepulveda, at a nearby gas station. Warning Gary to stay away from his children, he grabbed Mark's bicycle, put it in the trunk of his car, and drove away.

After returning home, Sbalbi had an apparent change of heart. At about 9:00 P.M., he put Gary's bicycle in his car and drove to Sepulveda's house to drop it off for Gary. When he arrived, he saw Gary, his girlfriend, and Sepulveda standing outside. Gary was talking on a cordless phone. Sbalbi, who knew that the defendant kept a number of guns at his house, called out to Gary: "Are you calling your father? Is he going to bring his guns over?" Gary nodded affirmatively, and Sbalbi drove back to his house.

Arriving home, Sbalbi sat on the front steps to his house, less than twenty feet from the street. His wife and four children were inside. Within minutes, the defendant, driving a Ford Bronco truck, pulled up to the house and asked Sbalbi where Gary was. Sbalbi said that Gary was at Sepulveda's house, and the defendant drove away. Sbalbi watched the defendant drive to the end of the street, turn around, and drive back toward Sbalbi's house. As he left his front stoop and began to walk toward the back of his house, Sbalbi saw the defendant drive alongside his house. It was about 9:35 P.M. The street lights and at least one neighbor's lamp post were lit. Sbalbi looked right into the defendant's face. He also saw the defendant's extended arm and a flash of light while hearing the ringing sound of five or six shots. Sbalbi threw himself to the ground. Inside the house, his wife and children were screaming.

No one was hurt. There were plaster chips scattered all about the living room and bullet holes in the couch, wall, and ceiling. Sbalbi's wife immediately called the police. Their investigation revealed six nine millimeter bullet holes. One of those bullet holes was in a couch, just inches away from where the Sbalbis' baby had been sleeping. The police also recovered four spent nine millimeter shell casings and an ammunition clip for a nine millimeter, semiautomatic weapon in the street outside the Sbalbi house.

Sbalbi told the police about his brief conversation with the defendant outside his home and the subsequent shooting. He described the vehicle from which the shots were fired, identified

the defendant as the shooter, and gave the defendant's address. The police immediately went to the defendant's home. At their request, the defendant removed a key from a pocket in his trousers. Using that key, the police unlocked a metal gun cabinet that they found in a bedroom closet. Among the numerous firearms found inside the cabinet was a nine millimeter handgun.

Within an hour after the shooting, the police brought Sbalbi to the defendant's home. While seated in a police cruiser, Sbalbi positively identified the defendant as the man had who shot at him.

b. *the defendant's case.* While conceding that the gun found in his cabinet was the gun used in the shooting, the defendant sought to establish that Gary had fired the shots at Sbalbi and into his house. Gary testified as follows.

After trying to retrieve his helmet from Sbalbi, Gary saw Mark, "traded" bikes with him, and then met up with his girlfriend and Sepulveda. They rode their bicycles to a local gas station where they were confronted by an angry Sbalbi. According to Gary, Sbalbi hit him in the face twice, took Mark's bicycle, and left the area. Gary, his girlfriend, and Sepulveda returned to Sepulveda's house at about 9:10 P.M. Sepulveda was riding his bicycle while Gary and his girlfriend both rode on another bike belonging to Gary.

Upon arriving at Sepulveda's house, Gary remained outside and used a cordless telephone to call the defendant and ask him to drive him and his girlfriend home. He explained to his father that he did not have a bicycle and that his girlfriend had to get home.[3] While Gary was speaking with the defendant, Sbalbi drove up, and returned his bicycle to him. At some point thereafter, the defendant appeared and drove Gary and his girlfriend back to the Gaudette house. Gary's girlfriend then borrowed his bicycle so that she could get home.[4]

Gary related that as his father dressed for work, he (Gary) took the keys to his father's truck and gun cabinet. He testified

---

[3] Gary's girlfriend testified that although Gary had a bicycle, he called his father because he did not want to ride together on a single bicycle with his girlfriend up a hill to his house.

[4] As put by the judge in her memorandum of decision on the defendant's motion for new trial, Gary's testimony "simply didn't make sense."

that he removed a nine millimeter gun from the cabinet, climbed into the defendant's truck, drove to the Sbalbis' house, fired the shots in issue, drove home, parked the defendant's truck, and returned the gun to its cabinet. According to Gary, all this was done without his parents' knowledge. Although it was undisputed that Gary did not have a driver's license, he insisted that he knew how to drive both the defendant's Dodge Ram Charger truck and his mother's Ford Bronco. He claimed that when he was "little," his brother would let him drive.

2. *The arguments.* Against the backdrop of the recited evidence, we take up the defendant's arguments.

a. *admissibility of prior consistent statements.* Because he was moving to Florida and would be unavailable to testify at trial, the parties agreed to videotape their examination of Danny Sepulveda. In response to questions put by defense counsel, Sepulveda revealed that shortly after the shooting in issue, he received a telephone call from Gary, asking that he go and retrieve a gun clip that he had dropped in the area of Mark Sbalbi's house.[5]

When defense counsel offered Gary's conversation with Sepulveda in evidence, the judge sustained the Commonwealth's objection and explained the bases of her ruling. She reasoned that because Gary was no more than a witness in the proceedings, his statements to Sepulveda could not be deemed admissions of a party opponent. Nor could the statements be treated as declarations against penal interest: Gary was available to testify. Moreover, Gary's state of mind at the time he made the statements was irrelevant. Although not argued by defense counsel at trial, the judge also determined that the statements were not admissible as prior consistent statements. This conclu-

---

[5]Specifically, Sepulveda testified:

"He asked me if I had heard some shots. I said 'Yes.' He said, 'Can you do me a favor?' I said, 'All right.' And he said, 'Go pick up a clip, a gun clip that — that is down the street by Mark's house.' And I was like, 'What?' So I just went back outside with my father and I — the street was filled with cops so I didn't do anything. . . . [Gary] just told me to go pick up a clip that he dropped, a clip from a gun, so it came to mind that it was probably him."

sion was based upon her finding that Gary's testimony had not been impeached by an allegation of "recent contrivance."

On appeal from his convictions and from the denial of his motion for a new trial, the defendant argues that the judge erred in ruling that Gary's conversation with Sepulveda was not admissible under the "prior consistent statements" exception to the rule against hearsay and in rejecting the claim that his trial attorney was ineffective for failing to convince her otherwise.[6]

For purposes of decision, we assume without deciding that the Commonwealth's examination of Gary created an insinuation that he was prevaricating. Upon the defendant's motion for a new trial, the judge concluded that even had the defendant's trial attorney argued that Gary's statements to Sepulveda were admissible on the grounds that they were prior consistent statements, she would have sustained the Commonwealth's objection on the basis that Gary made the statements at a time when he had a motive to fabricate.

As stated in *Commonwealth* v. *Rivera*, 430 Mass. 91, 99-100 (1999), the necessary evidentiary foundation for the admissibility of prior consistent statements is:

> "As a general matter, a witness's prior statement that is consistent with his testimony at trial is inadmissible. *Commonwealth* v. *Martinez*, 425 Mass. 382, 396-397 (1997). However, if the witness's trial testimony is impeached by a claim of recent contrivance or inducement, a prior statement made before the witness had an incentive to fabricate testimony may be admitted. Even then, 'these statements are admissible only to rebut the claim of recent fabrication, not to prove the truth of the matter.' *Id.*, and cases cited . . . . Trial judges are granted 'wide discretion in deciding whether the circumstances warrant the admission of a witness's prior consistent statements when he has been *or will be* impeached with an inconsistent statement' (emphasis supplied). *Commonwealth* v. *Saarela*, 376 Mass. 720, 723 (1978). See *Commonwealth* v. *Zukoski*,

---

[6]No matter how couched, the main issue before us is whether Gary's conversation with Sepulveda was consistent with his trial testimony and, therefore, admissible to rebut any suggestion made by the Commonwealth that his trial testimony was contrived.

370 Mass. 23, 27, (1976) (trial judge has 'range of discretion in determining whether a suggestion of recent contrivance exists in the circumstances')."

We see no abuse of discretion or other error of law in the judge's ruling.

It is the defendant's argument that any motive Gary might have had to lie could not have arisen until after the defendant was arrested. The evidence, the defendant claims, shows that Gary made his statements to Sepulveda shortly after the shooting which, according to Sbalbi, occurred about 9:35 P.M., whereas the defendant's arrest took place much later. This argument completely fails to take into account both the evidence of Gary's knowledge of the events of the day, and his relationship to the defendant. We think that when this evidence is put into the balance, a judge reasonably could conclude, as matter of discretion, that the defense had failed to show that the statements in question were made "before the witness had a motive to fabricate." *Ibid.*

b. *the prosecutor's closing argument.* Although the defendant did not object to all the remarks made by the prosecutor in his closing argument about which the defendant now complains, the judge considered each of them in ruling upon the defendant's motion for a new trial. We, therefore, consider all his claims as if they had been preserved properly for appellate review, see *Commonwealth* v. *Hallet,* 427 Mass. 552, 554, 558 (1998), and examine them in light of the evidence and the judge's instructions to the jury. See *Commonwealth* v. *Santiago,* 425 Mass. 491, 500 (1997); *Commonwealth* v. *Burns,* 49 Mass. App. Ct. 677, 679 & n.5 (2000).

We have recited the strong evidence against the defendant, that is, Sbalbi's identification of him and the basis for the reliability of that identification. See *Commonwealth* v. *Pagano,* 47 Mass. App. Ct. 55, 63 (1999) (identification testimony on similar circumstances "made a potent case for conviction"). Although the judge did not refer specifically to any particular statement made by the prosecutor in his closing argument, she twice informed the jurors that closing arguments were not evidence. She also instructed the jurors that, in their deliberations, they

were not to be swayed by sympathy, emotion, or concern about the effect or consequences of their decision.

It is on this basis that we turn to the defendant's complaints about six statements made by the prosecutor in his closing argument. The defendant's arguments can be summarized as complaints that the prosecutor improperly and prejudicially sought to inflame the jury by unfairly attacking the character and demeanor of the defendant and his son; attempting to lure the jurors beyond a calm consideration of the evidence; insinuating that because the police had no doubt about the identity of Sbalbi's shooter, neither should they; misstating the evidence; and vouching for Sbalbi's credibility.[7]

Of the six statements in issue, there are only two that merit some comment, albeit slight. The first of the two claims concerns the prosecutor's argument that the defendant should be ashamed for sitting by while his young son lied and sought to shoulder the blame for the crimes under consideration. See note 7, *supra.* Even if this comment improperly impugned the defendant's character, we conclude that on the basis of the evidence, particularly Sbalbi's identification of the defendant, and the jury instructions, reversal of his convictions is not warranted. See *Commonwealth* v. *Costello*, 36 Mass. App. Ct.

---

[7]The six statements are:

(1) "[P]arents protect their children, unless they are Gary Gaudette, Sr., because, see that man — that man ought to be ashamed of himself. He ought to be ashamed of himself because his fifteen year old kid, a juvenile, sat here and told us a lie."

(2) "Did [the defendant] look like the kind of guy who is going to drive by somebody's house and say, 'Excuse me. Have you seen my son?' No."

(3) "[I]magine . . . the horror that must have gone through [Sbalbi] as he watched the defendant . . ."

(4) "You know why [police did not submit the gun for fingerprints]? Because they had the kind of case that cops love. An eyewitness saying, Yeah, I know who it was and guess what? I know his name. And I know where he lives."

(5) "None of the police officers remembers seeing [Gary Gaudette, Jr.] [H]e wants us to believe he was there at the gun cabinet when the police officer opened it, but none of the police said they saw him."

(6) "What proof do we have from this doll [with a bullet hole in its head] that Gary Gaudette, Sr., committed this crime? Don't you think he [Sbalbi] would want to see the right person responsible for doing damage to this doll . . . ?"

689, 696-697 (1994). Compare *Commonwealth* v. *Burke*, 373 Mass. 569, 574-575 (1977); *Commonwealth* v. *Worcester*, 44 Mass. App. Ct. 258. 264-265 (1998).

As for the second claim, concerning the bullet holes in the doll, see note 7, *supra*, we accept the defendant's argument that the prosecutor's statement and display of the doll were dramatic. However, that is not to say that the prosecutor's argument was unduly prejudicial or otherwise improper. The doll had been admitted in evidence, and there was no dispute that the shots fired at Sbalbi and into his house had come from the defendant's gun. Compare *Commonwealth* v. *Hoppin*, 387 Mass. 25, 31-32 (1982). The prosecutor's remarks were an appropriate response to defense counsel's closing argument in which he challenged the probative value of the doll and argued that although the doll "may appear flamboyant and eye-catching and appealing, [it] has nothing to do with the case at hand." See *Commonwealth* v. *LeFave*, 407 Mass. 927, 939 (1990).

As for the remaining complaints about the prosecutor's closing argument, we need say no more than that the disputed remarks can be characterized as "enthusiastic rhetoric, strong advocacy, and excusable hyperbole," *Commonwealth* v. *Sanna*, 424 Mass. 92, 107 (1997), quoting from *Commonwealth* v. *Costa*, 414 Mass. 618, 629 (1993), rather than as unfair and improper argument. See *Commonwealth* v. *Rogers*, 43 Mass. App. Ct. 782, 786 (1997).

c. *the motion for new trial.* Represented by new counsel on appeal, the defendant claims error in the judge's denials of his motion for a new trial and his request for an evidentiary hearing on that motion. In his motion for new trial, the defendant claims that defense counsel was ineffective on two bases: (1) he failed to call a witness favorable to the defense; and (2) a conflict of interest so hampered him that he failed to rebut the prosecutor's suggestion that the defendant and his wife never told the police that Gary was the culprit because they knew that he was lying.[8]

We examine the judge's rulings to determine whether she

---

[8]Although the defendant complains of other errors in the judge's denial of his motion for a new trial, his fleeting assertions do not rise to the level of appellate argument within the comprehension of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

made a significant error of law or otherwise abused her broad range of discretion. Because the motion judge was also the trial judge, her rulings are "afforded special deference," *Commonwealth* v. *Hung Tan Vo*, 427 Mass. 464, 467 (1998), that is to say, her ruling will not be set aside "unless it is manifestly unjust." *Ibid.* To determine whether the judge erroneously denied the defendant's motion for new trial, we must ascertain, within the restrictions of the scope of our review, whether the defendant demonstrated both that his trial attorney's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974), and that his performance "likely deprived the defendant of an otherwise available, substantial ground of defence." *Ibid.*

We need say little about any failure of defense counsel to call a witness who would have testified that Sbalbi appeared to be intoxicated at the time of his confrontation with Gary at the gas station. Because both Sbalbi and his wife testified that he had been drinking that day, the testimony of the witness in issue would have been cumulative at best. The circumstances of this case do not provide us with any basis for a departure from the general rule that a failure to present cumulative testimony does not give rise to a claim of incompetency of counsel. See *Commonwealth* v. *Medina*, 20 Mass. App. Ct. 258, 261 (1985).

Of all the contentions on appeal, the only one with potential merit concerns the defendant's allegation that defense counsel's effectiveness was compromised by a conflict of interest. See *Commonwealth* v. *Shraiar*, 397 Mass. 16, 20 (1986) (conflict exists where "independent professional judgment" is impaired by personal interests or those of another client). He argues that defense counsel should have withdrawn from the case so that he could testify to the fact that the defendant and his wife did not tell the police about Gary's admission of guilt because defense counsel advised them against such action, all as set out in the affidavits of the defendant and his wife.[9] The defendant claims that defense counsel's testimony was necessary to rebut the

---

[9]The judge's memorandum of decision on the motion for new trial makes clear that she disregarded these affidavits. It is well established that, based on the grounds set out in the motion and the evidence presented at the defendant's

prosecutor's suggestion that the defendant and his wife refrained from telling the police about Gary's admission of guilt because they knew that Gary was lying.[10] Upon scrutiny, his argument fails.

In ruling on the defendant's motion for a new trial, the judge found that although Gary had proclaimed his guilt to defense counsel within six days after the shooting, defense counsel did not seek leave to withdraw from the case until the morning of the commencement of the retrial. His request was based upon his representation that the defendant wanted to call him to testify as a "corroborating witness" to Gary's early admission of guilt. Concluding that any such testimony would be inadmissible, she denied the motion.

Relying upon *Commonwealth* v. *Rondeau,* 378 Mass. 408 (1979), the defendant claims that the need for defense counsel's testimony to the effect that he had told the defendant, his wife, and Gary to remain silent about Gary's admission of guilt created a genuine conflict of interest. However, *Rondeau* is distinguishable. There defense counsel's testimony was not precluded by the rules of evidence. *Id.* at 415 ("no rule of evidence would have prevented [the attorney] from testifying"). Moreover, the attorney was the only witness without a criminal history who could testify to the defendant's alibi. *Id.* at 413.

In the present case, the judge found and concluded at trial, and on the motion for new trial, that any hearsay testimony concerning Gary's admission of guilt was inadmissible for those reasons discussed in part 2(a) of this opinion, *supra.* Further, and notwithstanding strong evidence to the contrary, Gary

trials, she was free to do so. See *Commonwealth* v. *Millen,* 290 Mass. 406, 410 (1935); *Commonwealth* v. *Lopez,* 426 Mass. 657, 663 (1998).

[10]The defendant does not argue that the prosecutor, before asking any witness about his or her failure to relate Gary's admission of guilt, did not comply with the requirements set out in *Commonwealth* v. *Brown,* 11 Mass. App. Ct. 288, 296-297 (1981). In any event, the prosecutor established that both Gary and his mother knew that the defendant had been arrested as well as where the police station was located, and that the defendant had not asked either of them to refrain from speaking with the police. See *ibid; Commonwealth* v. *Nickerson,* 386 Mass. 54, 58 n.4 (1982); *Commonwealth* v. *Roberts,* 433 Mass. 45, 48-51 (2000); *Commonwealth* v. *Cintron,* 435 Mass. 509, 522-525 (2001).

insisted at trial that he was the guilty party.[11] He also stated, in response to the prosecutor's questions, that defense counsel never advised against or otherwise precluded him from telling the police about his role in the crimes comprehended by the indictments.

In light of the overwhelming evidence of the defendant's guilt, the judge's findings and rulings on the motion for new trial, and the record before us, we conclude that any doubt concerning defense counsel's obedience to his ethical obligations (see S.J.C. Rule 1:7[b] and comment [4], 426 Mass. 1330-1332 [1998]) is insufficient to entitle the defendant to a new trial. Compare *Commonwealth* v. *Rondeau*, 378 Mass. at 416-417.

Because we find no error in the judge's determination that the defendant's motion failed to present any substantial issue requiring an evidentiary hearing, we conclude that it was well within the broad range of her discretion to deny the defendant's motion for a new trial without first conducting an evidentiary hearing. See *Commonwealth* v. *Birks*, 435 Mass. 782, 792 (2002), and cases therein cited.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

[11]As noted in her memorandum of decision, the judge was aware of the fact that Gary had been sequestered from the courtroom throughout the trial but that members of his family continually left the courtroom after any witness gave testimony concerning him.