IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---------------
No. 91-8235
---------------

UNITED STATES OF AMERICA,                              Plaintiff,

versus

ROBERT JOHN GREIG and
CRAIG WAYNE HANLEY,                                    Defendants.


-----------------------------------------------------------------------
Appeals from the United States District Court
for the Western District of Texas
-----------------------------------------------------------------------
(July 23, 1992)

Before BROWN, KING AND WIENER, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This controversy arises out of a successful reverse sting operation in Austin, Texas involving $230,000 and 500 pounds of marijuana, for which Appellants Greig and Hanley were convicted of marijuana conspiracy offenses. We affirm Hanley's conviction and sentence. With respect to Greig, however, we find that his counsel had a conflict of interest which denied Greig his Sixth Amendment right to effective assistance of counsel. Accordingly, we reverse and remand to the district court for a new trial.


*The Sting*

Undercover DEA agent Sanchez and government informant Clark

arranged with Craig Hanley, Ernest Vasquez, and Daniel McGarrigle to find a buyer for a 500 pound load of marijuana.  After several telephone conversations, agent Sanchez met with Hanley on September, 19, 1990 and showed him the marijuana.  On September 20, Sanchez met with Hanley, Vasquez, and McGarrigle to finalize the deal.  Robert Greig was contacted as a potential buyer and the same day, agent Sanchez showed Greig the marijuana after which they agreed on a site for the exchange later that day.  Greig arrived at the designated time and place carrying a cardboard box full of $230,000 in cash.  Greig, Hanley, Vasquez and McGarrigle were then arrested.

In October, 1990, Greig, Hanley and Vasquez were charged with (1) conspiring to possess with intent to distribute 500 pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1)[1] and 846;[2] and (2) attempting to possess with intent to distribute 500 pounds of marijuana, in violation of 21 U.S.C. 841(a)(1) and 846.[3]  Vasquez and McGarrigle entered guilty pleas, and Greig and Hanley were tried together before a jury.  Greig was found guilty on both

[1]Section 841(a)(1) provides in pertinent part:

...[I]t shall be unlawful for any person knowingly or intentionally  ... to distribute  ... a controlled substance....

[2]Section 846 provides in part:

Any person who ... conspires to commit any offense defined in [Title 21 of the United States Code] ... [shall be guilty of an offense against the United States.]

[3]Section 846 also prohibits attempts to commit offenses under Title 21 of the United States Code.

2

counts, and was sentenced to two concurrent 136 month terms of imprisonment, two concurrent five year terms of supervised release, a fine of $17,500 and a mandatory special assessment of $100. The jury found Hanley guilty only on the conspiracy count, and he was sentenced to 108 months of imprisonment, five years of supervised release and a $50 mandatory special assessment. Both Greig and Hanley appeal.

Greig raises a number of objections to the verdict and his sentence, complaining that the district court erred by (1) refusing to offer him the opportunity to substitute counsel; (2) allowing the Government to call informant Clark as a rebuttal witness; (3) increasing his sentence for obstruction of justice; (4) failing to decrease his sentence for acceptance of responsibility for his crime; and (5) increasing his sentence for his role as leader of the conspiracy. Hanley, on the other hand, raises the single argument that the court erred in refusing to give his proposed jury instruction regarding his alleged good faith belief that he was a government informant. We first turn to Greig's ineffective assistance of counsel claim.

## I. *Greig's Sixth Amendment Right to Effective Assistance of Counsel*

*The Critical Sequence of Events Behind It All*

On February 19, 1991, before Greig's and Hanley's trial began, the court held Ernest Vasquez' rearraignment proceeding. There Vasquez' lawyer brought to the court's attention the following improper communications by Greig's counsel. He told the trial

3

judge that after he informed Greig's lawyer of Vasquez' plea negotiations with the Government, Greig approached him and Vasquez stating, "[t]hey [the Government] cannot convict me without your testimony."[4] Vasquez' lawyer then stated that he advised Vasquez to have no further contact with Greig. Vasquez' lawyer next explained to the court that after a plea agreement had been signed, Vasquez was asked by Greig to meet with Greig and Greig's lawyer. Vasquez met with them and was advised to plead not guilty based upon a valid entrapment defense. Vasquez' lawyer then reported to the court a second meeting. He stated that Greig and his counsel visited Vasquez' job site and again suggested that Vasquez not plead guilty on the basis that he had a valid entrapment defense. He reported that Greig's lawyer in this meeting also told Vasquez that he should seek other counsel. Finally, Vasquez' lawyer complained to the trial judge that Greig's lawyer never asked for his permission to consult with Vasquez; never informed him of the fact that he twice met with Vasquez; and never attempted to discuss with him the entrapment defense.

On the same day, prior to jury selection at the start of the trial, the district court informed Greig's counsel that, in his absence, "the Court heard evidence today of that on two different occasions you personally visited with Mr. Vasquez, advised him that he should not plead guilty, that he had a defense, and that his lawyer was not doing for him what another lawyer should do or be

---

[4]In return for a lessened sentence, Vasquez' plea agreement with the Government required him to testify at Greig's trial.

4

able to do, that he should get another lawyer." The court then stated that a disciplinary proceeding would be held during jury deliberations at the end of Greig's trial.

On February 21, outside the presence of the jury and while they were deliberating in Greig's trial, the trial judge conducted the disciplinary proceeding, hearing testimony from Vasquez, Greig and their respective lawyers. The trial court did not make a ruling at the hearing, and took the matter under advisement until after the completion of Greig's sentencing.

At Greig's sentencing hearing on April 15, 1991, Greig was sentenced under § 3C1.1 to an extra 27 months for obstruction of justice as a result of his participation in the illicit meetings with Vasquez.[5] Not until the completion of Greig's sentencing did the trial court then announce its order permanently barring Greig's lawyer from appearing as counsel before the Western District Court of Texas.[6]

Greig now asserts that his lawyer's misconduct created a

---

[5]Section 3C1.1 of the Sentencing Guidelines provides that if the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the offense charged, the offense level is to be increased by two levels. As a result of the obstruction of justice enhancement, Greig's offense level was increased from 30 to 32, which added approximately 27 months to his sentence using the mid-point of the guideline range.

[6]As is this is not before us, we make no comment on the propriety of the court's sanction disbarring Greig's counsel. We add, however, that Greig's lawyer later appealed his disbarment to this court. We reversed and remanded the matter after finding that the district court applied the incorrect evidentiary standard in reaching its conclusion that Greig's lawyer should be disbarred. *See In re Medrano*, ___ F.2d ___ (5th Cir. 1992).

conflict of interest, violating his Sixth Amendment right to effective assistance of counsel. We agree. The trial court, being aware of critical facts, erred in not holding a *Garcia*[7] hearing to insure that Greig was fully informed of his counsel's ethical violation and whether Greig nevertheless wanted counsel to continue in his defense.

### (1) *No Questions Asked*

A defendant's right to effective assistance of counsel includes the right to representation free from a conflict of interest. *Mitchell v. Maggio*, 679 F.2d 77, 78-79 (5th Cir. 1982). Nevertheless, we have long held that, like the right to counsel of any kind, the right to conflict-free counsel can be waived. *United States v. Howton*, 688 F.2d 272, 274 (5th Cir. 1982). For a waiver to be effective, the record must show that the trial court determined that it was knowingly, intelligently, and voluntarily done:

> As in Rule 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

---

[7]*United States v. Garcia*, 517 F.2d 272 (5th Cir. 1972).

*Garcia*, 517 F.2d at 277-78. Plainly stated, under *Garcia*, we instructed trial courts in the Fifth Circuit to conduct a hearing, now commonly known as a *Garcia* hearing, to ensure that the defendant (1) is aware that a conflict of interest exists; (2) realizes the potential hazards to his defense by continuing with such counsel under the onus of a conflict; and (3) is aware of his right to obtain other counsel. *United States v. Casiano*, 929 F.2d 1046, 1052 (5th Cir. 1991).

In *United States v. White*, 706 F.2d at 506 (5th Cir. 1983), after finding an actual conflict of interest, we held that the defendant's waiver of his counsel's conflict of interest was legally ineffective because of the trial court's clear failure to follow *Garcia*. Counsel in *White* was under investigation by a grand jury regarding his participation in his client's escape from jail. After finding an actual conflict of interest, we reversed based upon the defendant's invalid waiver of the conflict. Although the trial court's inquiry in *White* was more detailed than the inquiry made by the trial judge in the instant case, we nevertheless found failure with the procedure since neither the court, the defense attorney, nor the prosecutor informed the defendant of the precise manner in which he might be prejudiced. Instead, the court placed complete reliance upon counsel's statement that he had informed his client of the dangers of the conflict of interest. *Id*. at 509.

The record leaves no doubt that the trial court failed to make any inquiry whatsoever as to whether Greig was aware of the

7

conflict and its potential hazardous effects upon his defense. While we recognize that a trial court does not always have an affirmative duty to inquire into the possibility of a conflict of interest,[8] it does have a duty to conduct a hearing once it has been alerted and certainly when it knows of the existence of an actual conflict of interest.[9] The record makes clear that Vasquez' attorney, on the same day that Greig's trial began, informed the court of unethical meetings between Greig, Greig's lawyer and Vasquez, which ultimately resulted in an enhancement to Greig's sentence for obstruction of justice. The court had a duty to inquire further into Greig's counsel's conflict of interest. Based on the trial court's failure to conduct even a barebones *Garcia* hearing, we hold that Greig could not have knowingly and voluntarily waived his right to conflict-free counsel.

### (2) *Ethical Violation Created Actual Conflict*

The Government contends that the court's failure to hold a *Garcia* hearing is irrelevant because no actual conflict of interest existed. Although we agree with the Government that the necessity

---

[8]*See United States v. Medel*, 592 F.2d 1305 (5th Cir. 1979), where after finding that no actual conflict existed, we held that the trial court does not have an affirmative duty to inquire into the possibility of a conflict when defense counsel never indicated to the court that a conflict might exist, and when nothing in the record alerts the court to such a possibility. *Id*. at 1312-13.

[9]*Compare United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985), holding that there was no error for failure to hold *a Garcia* hearing, since the necessity of a hearing is triggered only by an actual conflict of interest.

for such a hearing is triggered only by an actual conflict,[10] there is little doubt that an actual conflict existed here.

Here, counsel was in the position of simultaneously having to defend himself as well as his client regarding their potentially criminal activity. Like his client, counsel was open to an indictment for obstruction of justice based on their contacts with Vasquez.[11] At the very least, counsel faced severe disciplinary measures, including monetary sanctions, and indeed the very loss of the right to appear as counsel in the whole Western District of Texas. His alleged conduct was highly unethical and clearly violated the Model Code of Professional Responsibility as well as the American Bar Association's Model Rules of Professional Conduct.[12]

---

[10]*U.S. v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985).

[11]F.R.Crim.P. § 1512(c) provides:

(c) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from-

　　(1) attending or testifying in an official proceeding;
　　　　　　*　　*　　*
or attempts to do so, shall be fined not more than $25,000 or imprisoned not more than one year, or both.


[12]Greig's counsel was in clear violation of both the American Bar Association's Model Rules of Professional Conduct and the Model Code of Professional Responsibility. Rule 4.2 of the Model Code provides:

RULE 4.2 COMMUNICATION WITH PERSON
REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation

We find persuasive the Third Circuit's reasoning in *Government of Virgin Islands v. Zepp*, 748 F.2d 125 (3d Cir. 1984). There the defendant's lawyer did not withdraw despite the fact that he faced a potential indictment for destruction of evidence in his client's case.[13] In finding an actual conflict of interest, the court reasoned:

> Even if not criminally charged for such events, trial counsel could have faced severe disciplinary consequences if it were ever known that he was involved in the destruction of evidence. Trial counsel neither avoided professional impropriety nor the appearance of impropriety.... In circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest.

Id. at 136 (citations omitted).

In *United States v. McLain*, 823 F.2d 1457 (11th Cir. 1987), the defendant's counsel was under investigation by the same United States attorney's office prosecuting the defendant. Further, certain assistant U.S. attorneys suggested to the defendant's counsel that his own indictment could be delayed until after the

---

> with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law.

The Model Code's Disciplinary Rule 7-104(A)(1) is substantially identical.


[13]After a raid and sweep search of Defendant's premises by officers and narcotics agents, Defendant's attorney arrived at the house. Officers then heard a toilet flush several times and Defendant was arrested. Later, a search of the septic tank produced 40 plastic bags, 20 of which tested positive for cocaine residue. *Zepp*, 748 F.2d at 128.

completion of his client's trial. Finding an actual conflict of interest, the Eleventh Circuit concluded that counsel was under an ethical obligation to inform his client of the investigation and the possibility that it would affect his judgment. Specifically, the court held that since it was in counsel's best interest to have a lengthy trial, he could not have adequately represented his client in exploring possible plea negotiations. *See also United States v. Cancilla*, 725 F.2d 867 (2d Cir. 1984).[14]

A few cases in our own circuit also help demonstrate the actual conflict present in this instance. In *White*, 706 F.2d at 506, counsel was under investigation by a grand jury regarding his participation in his client's escape from jail. We found, without question, that these circumstances created an actual conflict of interest,[15] and reversed based upon the defendant's invalid waiver of the conflict. *See* discussion *supra*. The same lawyer, in a related case, *United States v. Snyder*,[16] 707 F.2d 139 (5th Cir. 1983), was disqualified by the trial court from representing White's co-conspirator and accomplice, Snyder, in his trial. The trial court reasoned that since the lawyer was an indicted co-

---

[14]Cancilla involved a situation where counsel was involved in criminal activity related to that for which Defendant was convicted. As in *Zepp*, 748 F.2d at 125, the Second Circuit found that counsel's potential criminal liability created an actual conflict.

[15]*Id*. at 509 n.3.

[16]Snyder, the defendant, was White's cellmate and was convicted for conspiring and aiding and abetting in White's escape. Snyder and White also shared the same lawyer, who was also indicted for aiding White to escape.

conspirator, a conflict existed meriting disqualification. Although we agreed with the court's determination that an actual conflict existed, we affirmed the trial court's disqualification based on our policy to preserve the integrity of the judicial system.[17]

Likewise, we are convinced that the events in this case resulted in an actual conflict of interest, a conflict which Greig was given no opportunity to waive. This is not the end of the line for Greig, however. For Greig to prevail, we must also find that his counsel's conflict of interest adversely affected his performance.

(2) *Conflict Adversely Affected Counsel's Performance*

The existence of an actual conflict does not warrant setting aside the conviction in a criminal proceeding if the error had no "adverse effect" on the judgment. *United States v. Abner*, 825 F.2d 835, 843 (5th Cir. 1987). "Adverse effect is not the equivalent of prejudice, the reasonable probability of a different result, as the term 'prejudice' is defined in *Strickland*.[18] Injury sufficient to

[17]Disqualification of an attorney may be based on either of the following grounds: (a) conflict of interest, or (b) integrity of the judicial system. *Snyder*, 707 F.2d at 145. Relying on the second ground to affirm the disqualification, we held that it was not necessary for us to reach the question of whether the defendant could have waived the conflict. *See also McCuin v. Texas Power & Light Co.*, 714 F.2d 1255 (5th Cir. 1983), where we affirmed the lawyer's disqualification based on the necessity to maintain the bar's high ethical standards.

[18]*Strickland* articulates the general standards for judging the various ineffectiveness claims. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Conflict of

justify reversal is presumed from the showing of adverse effect." *Id.* (citing *Nealy v. Cabana*, 782 F.2d 1362, 1365 (5th Cir. 1986).

Although adverse effects are not always readily apparent from the record, our examination of the record provides ample evidence that counsel's conflict had an adverse effect on both Greig's trial and sentence.

First, we find at the outset that Greig's counsel was preoccupied with his own disciplinary proceeding. Counsel was warned at the very start of the trial that he would soon be required to show cause why he should not be disciplined because of his contacts with Vasquez. Throughout Greig's trial, counsel must have been plagued by the fear of sanctions, which could, as they actually did, result in disbarment in the Western District. Added to that was the uncertainty of whether he would be indicted for obstruction of justice.

As evidenced by the following exchange at Greig's trial, counsel failed to defend Greig vigorously and single-mindedly

---

interest claims warrant a limited presumption of prejudice, and any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. *Id*. at 692.

The Strickland Court reasoned that such a limited presumption is necessary on the grounds that:

> it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Strickland*, 466 U.S. at 692.

13

completely free from his own necessity of avoiding incrimination, sanctions or even disbarment. The Government on direct examination asked Vasquez whether he had met with Greig and Greig's attorney without his lawyer being present. On redirect, the Government similarly questioned Vasquez about whether Greig and Greig's lawyer tried to convince him to abandon his guilty plea and not testify against Greig. Uninterrupted by objection from Greig's counsel, Vasquez responded yes. Moreover, Greig's counsel made no attempt on cross-examination to counter Vasquez' testimony. On recross, instead of attempting to in some way diminish the unfavorable testimony against his client, counsel immediately covered his own tracks:

Q [Greig's Counsel]  And so I never went ahead and -- and told you or intimidated you or harassed you in any way, did I, sir?

A [Vasquez]  No, sir.

Q  In fact, if anything, I told you, "Perhaps your attorney doesn't know about this tape, go play it to him and discuss it with him," correct?

A  Correct.

Q  And isn't it true that I also told you that I could not go ahead and represent you because I was representing Mr. Greig, correct?

A  Correct.

Q  And you asked me that if in fact you chose to switch to another lawyer, if I could recommend one, and I said, "Well, I can recommend a friend of mine, Mr. Cantu," correct?

A  Correct.

Regardless of the truthfulness or untruthfulness of Vasquez' answers, it is plainly obvious to this court that Greig's counsel was preoccupied with conducting his own defense. We cannot ignore

14

the fact that all of this could have been easily avoided by the court conducting a *Garcia* hearing to ensure that Greig was fully informed of his counsel's conflict.

Though the disciplinary proceeding was held at the end of Greig's trial while the jury was deliberating, counsel's representation of Greig at the proceeding further demonstrates counsel's preoccupation. After first questioning Vasquez, counsel called his client Greig to the stand to testify about their meetings with Vasquez:

Q [Counsel]  Did I ever tell him that his lawyer wasn't doing a good job?

A [Greig]  I can't say I didn't say that.

Q    Did you say that, Mr. Greig?

A    I -- yes.

Q    You're under oath.

A    More than once.

Q    You're the gentleman that told him to go ahead and switch lawyers?

A    Yes....

                    *    *    *

Q    And on -- on the second occasion, sir,... you were the one that drove me by his place of business, isn't that correct?

A    Right....

                    *    *    *

A    ...And I admit that I -- I tracked him down because I wanted to hear what Gary [Vasquez' counsel] had to say, what his defense was and what he was going to do....

Q    But I never told you to call Mr. Vasquez?

15

A    No, never.

When Greig finally on his own attempted to defend his actions in meeting with Vasquez, counsel quickly squelched Greig's explanation in terms which put the blame on Greig:

A [Greig]  ...I just wanted to make sure that Ernest [Vasquez] got all the facts, cut and dried, that's all he -- I ever wanted him to do, was be able to obtain all the facts to what was going on...I had nothing to do with trying to persuade him, to protect myself.

Q [Counsel]  I understand that, sir.  I understand.  I'm not trying to  -- to -- tell you that that's not important, but the issue is this:  Those two meetings that we had, the Court is concerned with that.  Did I initiate us meeting with Mr. Vasquez in either of those occasions?

A    No.

Q    In fact, the first time, I didn't know that he was going to go ahead and show up, did I?

A    No.

Q    And the second time, you didn't tell me even that you had called him, that we were on our way over there, you just drove me over there, didn't you?  In fact, isn't it true that you made me miss my 5:00 o'clock flight?

A    That's right.

Q    So, when you went ahead and called Mr. Vasquez, it wasn't because I requested you to do so, correct?

A    Correct.

Lastly, Government counsel cross-examined Greig at the disciplinary proceeding.  The following exchange is evident of what counsel should have done in the first place:

Q [Government Counsel]  Were you concerned with Mr. Vasquez's welfare or were you more interested in preventing or prohibiting him or discouraging him from testifying against you?

A [Greig]  No, sir....

16

[Greig's Counsel]  Excuse me.  I'm going to object to this line of questioning.  It's clearly outside the scope of what we're here for.  The issue is --

THE COURT:  It's not at all outside the scope, Mr. Medrano [Greig's counsel].  You may want to advise your client concerning the Fifth Amendment -- that would be another thing entirely -- but it's certainly not outside the scope of your questioning of him.

[Greig's Counsel]  I will go ahead and advise my client, at this time, to go ahead and -- and not answer any questions concerning the motives or reasons why you went ahead and had conversations with Mr. Vasquez.

Counsel's advice to Greig to plead the Fifth Amendment, prompted incidentally by the judge, came way too late.  Although we certainly recognize that the entire purpose of the disciplinary proceeding was to permit Greig's counsel to defend his own conduct, he, on the other hand, may not do it at his client's expense. Greig's counsel failed in his duty both to protect and advance his client's interest.  As is clearly indicated by the exchange at the disciplinary proceeding, Greig was required more than once by his counsel's questions to implicate himself, while exonerating his counsel.  Crucial to our determination that counsel's conflict adversely affected his client is the fact that the above testimony at the disciplinary proceeding occurred before the sentencing hearing.  Even though the trial judge delayed ruling on counsel's disciplinary matter until after Greig's sentencing hearing, we still are left with no choice but to conclude that this whole incident had a detrimental effect on Greig's defense.  Even though counsel fully objected at the sentencing hearing to the court's obstruction of justice enhancement, this was too little too late. We repeat that this is something which an experienced trial judge

17

should and would anticipate occurring so that a knowing and intelligent waiver can then be made by following the procedures under *Garcia*.

Our inquiry ends here. We conclude that the district court's failure to hold a *Garcia* hearing after learning counsel had an actual conflict of interest, which later adversely affected his performance, entitles Greig to a new trial.[19] Any other course would simply not do justice. If we were to remand only for resentencing and enable Greig to find another lawyer, as the parties suggest, the same result would be inevitable, since most of the damage had already been done at the trial level and at the disciplinary proceeding. Even a different sentencing judge could not erase the harm caused at trial by counsel's conflict. Accordingly, we reverse Greig's conviction and remand to the district court for a new trial.


II. *Hanley: Jury Instruction More than Adequate*

Co-defendant Hanley's defense at trial was that he had a good faith belief that he was acting as a government informant, and thus did not possess the requisite criminal intent to support his conviction. His attack here is on the court's failure to give a "good faith" instruction.[20] He urges that the court's instruction

---

[19]Because we find in fact no waiver, we need not discuss whether the conflict in Greig's case was unwaivable. *See Plewniak*, 947 F.2d at 1288-89, where we question whether certain conflict of interests are unwaivable.

[20]Hanley's defense goes as follows: Approximately three months before the drug deal in the instant case, United States

18

was insufficient to convey his good faith defense:

> You may consider evidence that Defendant Craig Hanley was, or in good faith believed himself to be, a government informant in determining whether he had the requisite intent to become a conspirator.

Specifically, Hanley argues that the jury was wrongfully permitted to consider his good-faith belief defense only as one factor in determining whether he intended to conspire. Instead, he contends that his good faith defense should have been conclusive on the issue of intent and that the following proposed jury instruction should have been granted:

> Our law provides that a person does not have the criminal intent required for conviction if he acts as government informant or in the honest, good-faith belief that he is a government informant.

A district court's refusal to include a defendant's proposed jury instruction is reviewed under an abuse of discretion standard, and the trial court is afforded substantial latitude in formulating its instructions. *United States v. St. Gelais*, 952 F.2d 90, 93 (5th Cir. 1992); *United States v. Rochester*, 898 F.2d 971, 978 (5th Cir. 1990).

In determining whether the court abused its discretion, we

---

Customs Agent Walter Tylenda stopped an airplane on which Hanley was a passenger. Tylenda suspected that the airplane was transporting drugs into Mexico. Hanley and the owner of the plane consented to a search, but no drugs were found. Tylenda then gave his business card to Hanley and requested that Hanley notify him if he became aware of any drugs being transported across the Mexican border.

Hanley acknowledged at trial that he was not to take any action as informant before contacting Tylenda or another customs agent. In fact, about two weeks prior to the instant transaction, Hanley contacted Tylenda and informed him of a possible drug smuggling transaction in Presidio, Texas.

must determine whether the requested instruction (1) is a correct statement of the law; (2) was substantially given in the charge as a whole; and (3) concerns an important aspect of the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense. *United States v. Daniel*, 957 F.2d 162, 170 (5th Cir. 1992); *St. Gelais*, 952 F.2d at 93; *Rochester*, 898 F.2d at 978.

In *United States v. Welch*, 810 F.2d 485 (5th Cir. 1987), the defendant requested that the trial court give an instruction almost identical to the one requested by Hanley.[21] Reviewing for plain error, we concluded that the charge, read as a whole, sufficiently suggested to the jury that they must find specific intent before the defendants could be convicted.

In the recent case of *United States v. Daniel*, 957 F.2d at 170, the defendant also requested an instruction on good faith. Because the jury was properly instructed on the elements of the offense, including the requisite mental state, we held that a good faith instruction was not necessary.[22]

---

[21]The *Welch* defendants were also facing conspiracy charges, and requested the following charge:

> You may consider whether or not the defendants or either of them were cooperating with the F.B.I. with regard to the specific offense charge in the indictment in determining whether the defendants possessed the intent necessary to commit the crime charged.

[22]*See also United States v. Luffred*, 911 f.2d 1011, 1016 (5th Cir. 1990) and *United States v. Gunter*, 876 F.2d 1113, 1119-20 (5th Cir. 1989), holding that a good faith instruction was not required where the jury was properly instructed on the requisite mental states.

Similarly, the trial court in this case gave more than adequate instructions on the specific intent terms of "knowingly" and "willfully".[23]  Hanley was also given full latitude to testify concerning his good faith and to argue good faith to the jury. Accordingly, we hold that taken as a whole, the good faith instruction to the jury was adequate.[24]

In conclusion, we reverse Greig's conviction and remand for a new trial, and affirm Hanley's conviction and sentence.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

[23]The court instructed the jury as follows:

The word "knowingly" as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

The word "willfully" as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

[24]In any event, Hanley's proposed instruction is probably not a correct statement of the law, as the district court so concluded.  We agree with the lower court that a defendant might have a good faith belief that he was acting as government informant and still commit a crime with the requisite intent.