APPEALS COURT 
 
 COMMONWEALTH vs. FABIAN BELTRAN

 
 Docket:
 23-P-776
 
 
 Dates:
 November 13, 2024 – March 19, 2025
 
 
 Present:
 Rubin, Shin, & Hodgens, JJ.
 
 
 County:
 Worcester
 

 
 Keywords:
 Deriving Support from Prostitution. Trafficking. Attorney at Law, Conflict of interest. Conflict of Interest. Practice, Criminal, New trial, Assistance of counsel, Witness, Grand jury proceedings. Constitutional Law, Assistance of counsel. Intimidation of Witness. Witness, Intimidation. Evidence, Grand jury proceedings.
 
 

             Indictments found and returned in the Superior Court Department on September 9, 2016. 
            Pretrial proceedings were had before Janet Kenton-Walker, J.; the cases were tried before Daniel M. Wrenn, J., and a motion for a new trial, filed on January 5, 2022, was heard by him.
            Erin R. Opperman for the defendant.
            Elizabeth A. Sweeney, Assistant District Attorney, for the Commonwealth.
            SHIN, J.  The defendant appeals from his convictions of trafficking of persons for sexual servitude and deriving support from prostitution and from the order denying his motion for a new trial.  Among the arguments he raises is that his trial counsel had an actual conflict of interest that arose when the prosecutor alleged at a pretrial hearing that trial counsel conspired with the defendant to post the bail of the prosecution's key witness, Jane Doe,[1] who then fled Massachusetts.  The prosecutor also revealed that his office was investigating the matter.  Later, after the defendant's trial concluded, trial counsel was indicted and tried for witness intimidation and conspiracy to commit witness intimidation based on his involvement in Doe's flight.  He was acquitted of both charges.
            The defendant contends that the prosecutor's allegations against trial counsel created an actual conflict of interest in this case because they gave trial counsel an incentive to avoid exploring certain lines of defense or the possibility of a plea agreement for fear that it would provoke government action against him.  We agree.  Trial counsel could not serve the defendant with undivided loyalty in these circumstances because his own interests in avoiding prosecution or disciplinary action were inherently in conflict with those of his client.  Because trial counsel had an actual conflict of interest, the defendant is entitled to a new trial without a further showing of prejudice.[2]
            Background.  1.  Trial proceedings.  The defendant and his codefendant, Lewis Jennings, were each indicted on one count of trafficking of persons for sexual servitude and one count of deriving support from prostitution.  After jurors were empanelled, the trial was set to begin on May 29, 2018.  On that date the prosecutor told the judge then assigned to the case (first judge) that Doe, who had been incarcerated at a women's correctional center, had posted bail and had not appeared in court.  About an hour later, the prosecutor reported that he had "received some information that [an] individual was paid to bail [Doe] out" and that Doe "may be on her way to Maine or may be in Maine."  He further reported that the circumstances of Doe's disappearance could "become part of an ongoing investigation" and that he believed "there [was] something very serious that [was] going on behind the scenes."  The defendant and Jennings both moved for dismissal, which the first judge denied, and the trial was continued to the next day.
            The next morning, the prosecutor reported to the first judge that Doe had still not appeared and requested a continuance.  When asked whether he had any information that either the defendant or Jennings was involved in Doe's disappearance, the prosecutor replied that he "prefer[red] not to get into the details of what may be an open investigation."  The first judge then denied the defendant's and Jennings's renewed requests for dismissal and continued the trial to June 18, 2018.
            On June 14, 2018, Doe was arrested in Maine and interviewed there by Worcester police Detective Peter Roberge.[3]  Doe told Detective Roberge that a woman she did not know posted her bail on May 26, 2018.  Doe expected this to happen because her attorney had told her a few days before that someone had been calling to ask about the bail.  After Doe was released, a group of people drove her to a gas station, where the defendant was waiting.  The defendant asked Doe "why [she] was doing what [she] was doing" and told Doe that she "was fucking his life up."  He gave Doe drugs and money and told her to go to Maine, which she did.  While she was there, the defendant told her that she should not return to Massachusetts because the police would find her and make her testify and that she could come back when his "case was closed."
            The defendant was arrested for witness intimidation sometime between June 14 and June 18, 2018.  On June 19, 2018, the parties appeared before a different judge (second judge) to address pretrial motions in this case.  At that hearing the prosecutor revealed that he had transcripts of jail calls between Jennings and his girlfriend, Nashalee Cruz,[4] which, the prosecutor said, "suggest[ed] that the lawyers involved in the case . . . knew that [Doe] was being bailed, and [she] was not going to appear in Court on the day she was supposed to."  When the second judge asked whether "based on what was said on these jailhouse calls, . . . one could draw the inference that the lawyers knew [Doe] was going to be bailed out, and therefore, wouldn't appear," the prosecutor replied, "That's what I'm suggesting."  Trial counsel denied the prosecutor's allegations, claiming that he had "done nothing but advise [his] client, don't do anything with this witness."
            The prosecutor then provided the second judge with the transcripts of the jail calls, which occurred on May 27 and May 28, 2018.  In two of the calls,[5] Cruz told Jennings that "he" (inferably, the defendant) "was like . . . tell LJ [Jennings] that, to relax, that . . . the lawyers have already talked and they're all aware" and "I guess, um, his lawyer spoke to her lawyer and . . . they already talked about it or whatever."  In another call Cruz stated, "And then he called me, like, around 4:30 to show me on FaceTime.  He's, like, I'm the man, you see."[6]  Cruz then said, "I don't know what the thought process is behind none of that, like I don't get it, but it was his [inaudible],"[7] to which Jennings replied, "I should punch his lawyer in the face."  Later in the same call, Cruz said, "Like I don't even know why his lawyer would even suggest some crazy shit like that."  Jennings replied, "Yeah, but we shouldn't be talking about it on the phone, so.  That's a joint venture charge. . . .  Looks like I'll be rotting here for the next three months."
            After reviewing at least a portion of the transcripts, the second judge asked the prosecutor, "[Y]ou're suggesting that based on this, that the lawyers were aware that she had been bailed out?"  The prosecutor replied, "What I'm suggesting is, that there was a plan put in place . . . for [Doe] to be bailed out, to not appear at trial."  The second judge rejected this suggestion, stating that nothing "contained in that transcript" implicated the attorneys.  Later in the hearing, the second judge reiterated that she had "not seen any competent evidence" implicating the attorneys and added that "the bit of the transcript that [she] saw" indicated that "Jennings had nothing to do with it."
            Subsequently, the prosecutor filed a motion to introduce evidence of the defendant's involvement in posting Doe's bail as consciousness of guilt evidence.  In opposing the motion, trial counsel argued that the defendant was "denying these acts occurred" and that "litigat[ing] these allegations [would] create a trial within a trial."  After a third judge (trial judge) allowed the motion, the matter proceeded to trial on June 25, 2018.  On direct examination Doe testified that in March 2016 she went to a "trap house" on Thayer Street in Worcester to buy drugs.  There, she made an arrangement with the defendant and Jennings whereby she would work as a prostitute and give them the money she made, and they would supply her with drugs in exchange.  When questioned about the posting of her bail, Doe testified consistently with what she had told Detective Roberge during her interview.  In his cross-examination on the bail issue, trial counsel focused on the fact that it was not the defendant who actually posted the bail and suggested that Doe had a motive to lie.[8]
            The jury returned their verdicts on June 27, 2018, finding the defendant guilty on both charges.  Jennings was acquitted.
            2.  Grand jury proceedings.  Meanwhile, on June 21, 2018, and later on September 10, 2018, the Commonwealth called Cruz before the grand jury to give testimony concerning the witness intimidation allegations.  Cruz testified that on May 21, 2018, she noticed the defendant and trial counsel conversing in the hallway of the court house and heard trial counsel say, "It would be easier if she was out."  Cruz assumed that trial counsel was referring to Doe.  Five days later, the defendant called Cruz via FaceTime and said something to the effect of, "I'm the man" or "I got it, look what I have."  The defendant was in a car, and he directed his phone over his shoulder to show a woman in the back seat.  Cruz could see only part of her face but assumed the woman was Doe.  The next day, Cruz visited Jennings in jail and told him about the call.
            Cruz further testified that she told Jennings that "the attorney suggested it" but characterized that statement as a "[p]oor choice of words."  As she explained, she "didn't mean it like the attorney said hey, you should go do this," but "[k]nowing that he's his lawyer and knowing how dumb [the defendant] is, he shouldn't have made a comment like that because . . . that was going to make -- like could have . . . made [the defendant] think that it was okay to do something like that."  When asked whether she thought the lawyers were involved, Cruz stated she did not because "they were all dumbfounded" and "shocked" in court, "like nobody knew that [Doe] was bailed out."
            On September 4, 2019, a special prosecutor and Detective Roberge interviewed the defendant in prison.[9]  The defendant told them that trial counsel approached him in the court house at some point before trial and said, "If she's out, she's going to just leave, and . . . we got a shot at beating the case."  The defendant further stated that trial counsel gave him information as to where Doe was being held and that "her getting bailed out was his idea.  Like, I would have never even thought, in my right mind, and do something like that."  On October 7, 2019, the defendant gave testimony before the grand jury to the same effect.[10]
            On December 19, 2019, the grand jury voted to indict trial counsel and the defendant on one count of witness intimidation and one count of conspiracy to commit witness intimidation, and Doe's counsel on one count of conspiracy to commit witness intimidation.[11]  In June 2021 the Commonwealth granted the defendant immunity in exchange for his testimony against trial counsel, and the witness intimidation charges against the defendant were later dismissed.  After a jury-waived trial, both trial counsel and Doe's counsel were acquitted.
            3.  Motion for new trial.  In January 2022 the defendant moved for a new trial, claiming among other things that he received ineffective assistance of counsel under the Federal and State Constitutions because trial counsel was laboring under an actual conflict of interest once the prosecutor accused him of conspiring to post Doe's bail.  At the evidentiary hearing on the motion, trial counsel testified that he "had nothing to do with" posting Doe's bail and that he believed the prosecutor's allegations of wrongdoing on his part had been "put . . . to bed" once the second judge reviewed the transcripts of the jail calls and rejected the allegations.  Trial counsel further testified that he never considered arguing that the defendant acted in reliance on a conversation they had because "that would be suborning perjury."[12]
            Following the evidentiary hearing, the trial judge denied the defendant's motion in a detailed memorandum of decision, in which he stated that he credited trial counsel's testimony "for all purposes relevant to [the] motion."  At the same time, however, the trial judge assumed the truth of the testimony that Cruz gave before the grand jury.  The trial judge then concluded that the defendant failed to establish the existence of an actual conflict of interest because (1) trial counsel was not accused of being involved in the underlying crimes for which the defendant was on trial; (2) even if the jury believed that the defendant posted Doe's bail on the advice of trial counsel, they could still infer that the defendant's conduct reflected consciousness of guilt; and (3) even if the accusations against trial counsel prevented him from advising the defendant about the benefits of cooperating with the prosecution, the defendant failed to show that the prosecution would have offered concessions in exchange for the defendant's cooperation.  This appeal ensued.
            Discussion.  The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights entitle criminal defendants to representation from counsel free from conflicts of interest.  See Cuyler v. Sullivan, 446 U.S. 335, 348-350 (1980); Commonwealth v. Brown, 494 Mass. 326, 334-335 (2024).  To establish a Sixth Amendment violation on the basis of an actual conflict of interest, a defendant must show that the conflict "adversely affected his lawyer's performance."  Cuyler, supra at 350.[13]  In contrast, under art. 12, the existence of an actual conflict of interest is sufficient in itself to warrant a new trial.  See Commonwealth v. Hodge, 386 Mass. 165, 170 (1982).  That is, once a defendant establishes an actual conflict of interest, he is "required to prove neither actual prejudice nor adverse effect on his trial counsel's performance to entitle him to a new trial under art. 12."  Id.  See Brown, supra at 335; Commonwealth v. Martinez, 425 Mass. 382, 388 (1997).
            "An 'actual' or 'genuine' conflict of interest arises where the 'independent professional judgment' of trial counsel is impaired, either by [counsel's] own interests, or by the interests of another client."  Commonwealth v. Perkins, 450 Mass. 834, 852 (2008), quoting Commonwealth v. Shraiar, 397 Mass. 16, 20 (1986).  "The critical inquiry is whether the lawyer has a competing interest or responsibility that will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client" (quotations and citation omitted).  Brown, 494 Mass. at 336.  "It is the defendant's burden to present 'demonstrative proof detailing the precise character of the alleged conflict of interest.'"  Perkins, supra at 852, quoting Commonwealth v. Davis, 376 Mass. 777, 781 (1978).  The defendant can meet this burden "by reference to the trial record or through extrinsic evidence which may have been 'obscured from the court before and during trial.'"  Martinez, 425 Mass. at 390, quoting Davis, supra.
            "A conflict of interest normally arises whenever a defense attorney is himself culpable for the crimes charged against his client."  Shraiar, 397 Mass. at 23.  Here, as the trial judge noted in denying the defendant's motion, trial counsel was not implicated in the underlying crimes for which the defendant was on trial.  That is not dispositive, however.  The allegations and investigation against trial counsel were connected to his representation of the defendant on the charged crimes; the question is whether this gave him a personal interest that would "materially interfere with [his] independent professional judgment in considering" what courses of action to pursue on behalf of the defendant (citation omitted).  Perkins, 450 Mass. at 851.
            Although there appears to be no Massachusetts case factually on point, many Federal circuit courts have held that an actual conflict of interest exists when an attorney is alleged to have engaged in questionable conduct related to that attorney's representation of a criminal defendant and faces possible criminal charges or disciplinary action as a result.  For example, in United States v. Levy, 25 F.3d 146, 149-151 (2d Cir. 1994), the government informed the trial judge that the defendant's attorney might have been involved in a codefendant's flight from the United States and that it had opened a grand jury investigation into the matter.  The court concluded that this created an actual conflict of interest because "fearing answers that might incriminate himself, the defendant's attorney would have a strong personal desire to refrain from inquiring at the defendant's trial into certain matters that were directly relevant to, and potentially exculpatory of, his client."  Id. at 157.  Similarly, in United States v. Greig, 967 F.2d 1018, 1022 (5th Cir. 1992), the court concluded that "there [was] little doubt that an actual conflict existed" where, "[l]ike his client, counsel was open to an indictment for obstruction of justice based on their contacts with" a codefendant.  As the court explained, the conflict arose because "counsel was in the position of simultaneously having to defend himself as well as his client regarding their potentially criminal activity" and "[a]t the very least . . . faced severe disciplinary measures."  Id.  The court in Government of the Virgin Islands v. Zepp, 748 F.2d 125, 136 (3d Cir. 1984) (Zepp), held in a similar vein that an actual conflict of interest existed where counsel engaged in conduct that made him "potentially liable for aiding and abetting or encouraging the destruction of evidence" related to the charges against the defendant.  Because counsel faced potential criminal charges or disciplinary consequences for his conduct, the court found it "unrealistic . . . to assume" that he "vigorously pursued his client's best interest entirely free from the influence of his concern to avoid his own incrimination."  Id.  Other Federal circuit courts and State appellate courts have concluded likewise on analogous facts.[14]
            We find the reasoning of these cases persuasive.  In opposing the defendant's motion for a new trial, the Commonwealth did not contest the truth of Cruz's grand jury testimony that she heard trial counsel tell the defendant, "It would be easier if she was out," and the trial judge also accepted the testimony as true.  If a conflict did not arise at the moment trial counsel made this statement, one certainly arose once the prosecutor accused trial counsel of behaving improperly and revealed that his office was investigating the matter.  At that point trial counsel had a personal interest in avoiding exploring at trial all of the circumstances surrounding the posting of Doe's bail.  This in turn gave trial counsel an incentive not to pursue certain lines of defense to counter the Commonwealth's argument that the defendant's posting of the bail reflected consciousness of guilt.  An unconflicted attorney might have argued that the defendant acted not out of guilt, but because he understood trial counsel's statement that it would be easier if Doe were "out" as an instruction to post the bail.  Trial counsel, however, had an interest in not pursuing such a theory for fear that it could provoke criminal charges or disciplinary measures against him.  Indeed, when confronted with the allegations, trial counsel's response was to defend himself and potentially reveal attorney-client communications by stating, "I've done nothing but advise my client, don't do anything with this witness."  See Martinez, 425 Mass. at 391 (concerns regarding loyalty to client "made acute" by possibility that counsel breached client confidence).
            An actual conflict of interest existed in these circumstances.  Because of his conflicting personal interest, trial counsel had reason not to explore calling Cruz to testify about the conversation she overheard or to give the defendant full and impartial advice about whether to testify in his own defense.  See United States v. Fulton, 5 F.3d 605, 610 (2d Cir. 1993); Fortson v. United States, 979 A.2d 643, 652 (D.C. 2009).  In addition, trial counsel's personal interest was in conflict with pursuing the possibility of a plea agreement lest the defendant's cooperation reveal evidence about trial counsel's own conduct.  See Mannhalt v. Reed, 847 F.2d 576, 582 (9th Cir.), cert. denied, 488 U.S. 908 (1988) ("Exploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by a conflict of interest"); United States v. Cancilla, 725 F.2d 867, 870 (2d Cir. 1984) (counsel could not "impartially have given [defendant] advice on whether or not to take a guilty plea, since counsel might have feared that acceptance of a plea would turn on [defendant's] cooperation, which might lead to discovery of the link to counsel's own activities").  Accord Fulton, supra; United States v. White, 706 F.2d 506, 509 (5th Cir. 1983).  Trial counsel's own interests were therefore in conflict with his professional obligations to explore all avenues of defense and to give impartial advice to his client.  See Fulton, supra (actual conflict exists where "attorney may fear that a spirited defense could uncover convincing evidence of the attorney's guilt or provoke the government into action against the attorney").  Cf. Brown, 494 Mass. at 340-341 ("actual conflict burdening trial counsel . . . stemmed from the difficulty or impossibility of giving her client the benefit of a lawyer's detached and independent advice and the zealous defense to which he was entitled, where her client's defense required considering whether and how to attack the adequacy of her own professional performance").
            That trial counsel denied his involvement in posting Doe's bail, and was ultimately acquitted of witness intimidation, does not negate the existence of a conflict.  To be sure, had the prosecutor lodged allegations against trial counsel without any factual foundation, we might conclude differently.  See United States v. Jones, 900 F.2d 512, 519 (2d Cir.), cert. denied, 498 U.S. 846 (1990) (no actual conflict where, during trial recess, judge investigated prosecutor's allegations of ethical violations by defense counsel, and evidence before judge "indicated that the prosecutor's hysterics were without foundation in fact or law").  But here, the prosecutor supported his allegations with the transcripts of the jail calls.[15]  If that were not enough, in the six-day span between when the prosecutor made the allegations and the start of the defendant's trial, the prosecutor called Cruz to testify before the grand jury about the conversation she overheard.  See United States v. Daniells, 79 F.4th 57, 85 (1st Cir. 2023) (defendant established existence of conflict where government did "not appear to contest the contents of what [defendant] identified as the statements made by a grand jury witness to an investigator that implicated [counsel] in having engaged in improper communications with witnesses").
            These facts distinguish this case from Shraiar, 397 Mass. at 23, where the defendant claimed for the first time in a motion for a new trial that his attorney had participated in the crime of which the defendant was convicted.  The trial judge found after an evidentiary hearing that the defendant's allegation was false, and on this basis the court concluded that the defendant failed to prove the existence of a conflict.  See id. at 24 (defendant's "argument would establish a genuine conflict of interest, were it based on a sound factual premise").  Here, it was the prosecutor who made the allegations against trial counsel, supported with the transcripts of the jail calls and before the start of the defendant's trial.  Especially where the prosecutor also stated that his office was investigating the matter, his allegations raised the possibility of criminal charges against trial counsel.  See Zepp, 748 F.2d at 136 (even though "there [was] no direct evidence of wrongdoing by trial counsel," actual conflict existed where it was "clear that he was potentially liable for aiding and abetting or encouraging the destruction of evidence").  Cf. Cerro v. United States, 872 F.2d 780, 784 (7th Cir. 1989) (defendant failed to show actual conflict where there was "no evidence . . . that [counsel] or his partners were the objects of a criminal investigation either prior to or during [defendant's] trial" and "no evidence that [the] matters arose during trial or pre-trial").  And indeed, the Commonwealth initiated a grand jury investigation into trial counsel's conduct before the start of the defendant's trial, later prosecuted trial counsel for his conduct, and continues to take the position on appeal that trial counsel is guilty of witness intimidation.  Thus, unlike in Shraiar, there is a factual foundation for the defendant's claim of a conflict.  See Daniells, 79 F.4th at 87 ("we fail to see a basis for concluding that [counsel] would have had no . . . incentive" to pursue client's defense less vigorously, "given that the government does not contest the basis for concluding that [counsel] was implicated in the conduct that the government itself was investigating").
            Because the record establishes the existence of an actual conflict, the defendant was not required to show either prejudice or an adverse effect on trial counsel's performance to be entitled to a new trial.  See Brown, 494 Mass. at 335.  Thus, while we think that the defendant has a credible argument that the conflict adversely affected trial counsel's performance under Federal law, see supra n.13, we need not reach that question.
            Conclusion.  The order denying the defendant's motion for a new trial is reversed.  The judgments are vacated, and the verdicts are set aside.
So ordered.
            HODGENS, J. (concurring).  While I agree with the ultimate decision reached in this case, I write separately, from the perspective of "an ordinary fallible lawyer," Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), while eliminating "the distorting effects of hindsight," Strickland v. Washington, 466 U.S. 668, 689 (1984), in the hope of identifying precisely when defense counsel should have recognized the actual conflict of interest.  Such an analysis may be helpful to judges and lawyers in discerning and ultimately avoiding future conflicts.
            Prosecutors and judges are understandably reticent to intrude into the confidential relationship between a defendant and counsel -- particularly in a case such as this where the events first unfolded on the day scheduled for trial after defense counsel had been representing the defendant since the case was originally charged in the District Court two years earlier in 2016.  See Commonwealth v. Brown, 494 Mass. 326, 341 n.7 (2024) (judges "appropriately acknowledged the defendant's right to choose his own counsel under art. 12 [of the Massachusetts Declaration of Rights] and the Sixth Amendment" to the United States Constitution).  So, it is not surprising that when the prosecutor reviewed the jail calls on the eve of trial, he did not jump to the conclusion that the defendants' attorneys had done anything improper.  See, e.g., Commonwealth v. Shraiar, 397 Mass. 16, 22 (1986) (discussing effort of attorney "to maneuver the withdrawal of his adversary").  Contrary to the defendant's claim on appeal that the prosecutor alleged the existence of a conspiracy, the record shows that at most the prosecutor alleged that transcripts of the jail calls "suggest[ed] that the lawyers" knew the witness was being bailed and would not appear for trial.  That knowledge, if true, did not indicate any improper conduct by counsel, and the second judge understandably so concluded after reviewing the transcript of the jail calls:  "I don't think that there's anything contained in that transcript that would, in any way, implicate either of these attorneys."  It is neither improper nor uncommon for defense attorneys to learn a witness may post bail or may not appear for a trial.  In my view, neither a potential nor an actual conflict of interest was evident at this point in the proceedings, and the second judge was not required to do more than she did.
            A potential conflict emerged, however, after both defense attorneys protested what they perceived as an "insinuation" that they may have done something improper.  Counsel for the codefendant protested, "I will agree that I told my client that he is to have absolutely nothing to do with bailing this person out, because it would hurt his case, tremendously."  Similarly, the defendant's counsel protested, "I've done nothing but advise my client, don't do anything with this witness."  Thus, at this point in the proceedings, the revelations of counsel set up potential conflicts of interest.  For example, if the question surrounding the bail of the witness became an issue at trial, there was now a potential that counsels' memories of the events might be at odds with their clients' memories of the same events.  There is nothing in the record to show that counsel addressed these potential conflicts with their clients.
            This latent, potential conflict ripened into an actual conflict days later when counsel learned that another judge would allow the prosecution to offer evidence at the defendant's trial regarding bailing the witness, plying her with drugs, and secreting her in another jurisdiction for the duration of the trial.  The prosecution planned to offer this evidence as bearing on the defendant's consciousness of guilt, but counsel's defensive remark on the record about his conversation with the defendant effectively "foreclose[d]" the defendant from offering contrary evidence that he acted not out of guilt but out of his understanding (or misunderstanding) of counsel's advice.  Brown, 494 Mass. at 336, quoting Commonwealth v. Perkins, 450 Mass. 834, 851 (2008).  See, e.g., Shraiar, 397 Mass. at 21 ("A genuine conflict of interest arises whenever trial counsel is called upon to give testimony adverse to his client").
            Although counsel never testified at trial, his remark at the pretrial hearing was the equivalent of offering testimony adverse to his client (even if he may have thought at the time he was helping his client).  Bound by a duty of allegiance and undivided loyalty to his client, defense counsel should not have continued representation under the burden of this conflict without informed consent from his client.  Therefore, at a minimum, the defendant was entitled to advice about the conflict and the availability of alternative courses of action in addressing the consciousness of guilt evidence at trial.
            I do not believe this actual conflict depended at all on future events surrounding the prosecution of the defendant's counsel or the supposition that counsel may have feared potential exposure to future criminal or disciplinary action.  Defense counsel operated under an actual conflict of interest "from the time it became clear" to counsel that the consciousness of guilt evidence would be presented at trial.  Commonwealth v. Hodge, 386 Mass. 165, 168 (1982).  From that point on, even if he provided at trial a virtuosic performance marked by fearless and zealous advocacy, counsel had already deprived the defendant of constitutionally effective assistance through the evident conflict of interest.  Once demonstrating that an actual conflict exists, "the defendant is not to be put to the burden, perhaps insuperable, of probing the resolve and the possible mental conflict of counsel" (citation omitted).  Id. at 169-170.
            Our detection of a conflict, after reflecting on the record, should not be viewed as criticizing the judges who did not perceive a brewing conflict earlier and should not be viewed as overlooking the findings of the trial judge on the motion for a new trial.  None of the judges perceived an actual conflict at the time of these events, but none had the benefit of a complete record.  Also, following an evidentiary hearing on the motion for a new trial, the trial judge, acting within his discretion, credited counsel's testimony "for all purposes relevant to this motion."  Trial counsel, with almost thirty years of experience, testified that he "had nothing to do with" bailing the witness, believed the second judge "put [the issue] to bed" and rejected any hint of wrongdoing on his part, never discussed with the Commonwealth the bail issue, did not believe he was the "slightest" compromised in representing the defendant, represented the defendant with "110 percent" effort as for any client, and pursued a single justice appeal of the decision regarding the admissibility of consciousness of guilt evidence.  The judge's credibility finding is amply supported by the record and is entitled to deference.
            If our review were limited to determining whether the conflict resulted in actual prejudice, the credibility finding might well have been determinative of this appeal.  Under the safeguards of the Declaration of Rights, however, when an actual conflict has been shown the defendant is not also required to prove prejudice or an adverse effect on trial counsel's performance.  Thus, the defendant is entitled to a new trial here simply because counsel should have recognized an actual conflict of interest was afoot.  Apart from identifying that conflict, we need not assess counsel's performance at trial.  While we rely on judges and prosecutors to be vigilant about spotting conflicts of interest, this unusual case reminds us that defense counsel is primarily responsible for identifying and resolving such difficult and challenging questions before harm befalls the client and a new trial becomes necessary.  See Perkins, 450 Mass. at 852, 856.
 
footnotes

 
            [1] A pseudonym.
            [2] Resolving the appeal on this basis, we need not address the defendant's other arguments.
            [3] Roberge then held the rank of officer but later became a detective.
            [4] Cruz later changed her surname.  For simplicity we will refer to her as Cruz throughout this opinion.
            [5] The order of the calls is unclear from the transcripts.
            [6] As described further below, Cruz later testified before the grand jury that during this FaceTime call the defendant turned his phone to reveal a woman (inferably, Doe) sitting behind him.
            [7] Before the grand jury, Cruz testified that the inaudible portion, or "whisper part," was that "the attorney suggested it."
            [8] The only other prosecution witness testified briefly about driving Doe to the house on Thayer Street.  Neither the defendant nor Jennings called any witnesses.
            [9] A special prosecutor from Plymouth County took over the witness intimidation case around the time of the defendant's trial, which occurred in Worcester County.  The trial prosecutor presented Cruz's grand jury testimony on June 21, 2018, while the special prosecutor presented Cruz's grand jury testimony on September 10, 2018.  A different special prosecutor from Barnstable County represents the Commonwealth in this appeal.
            [10] During the defendant's testimony, a juror astutely asked, "Did it ever cross your mind that it may be potentially a conflict of interest by your lawyer . . . telling you to bail out someone . . . it never dawned on you that this seemed weird like why am I going to do this?"  The defendant replied, "Yeah, it was kind of weird at first, yeah.  I just followed what he told me like.  That was my lawyer, so."
            [11] The record does not establish precisely when trial counsel became aware of the grand jury proceedings.
            [12] Much of the evidentiary hearing focused on the defendant's separate claim that trial counsel had a potential conflict of interest because he was a candidate for District Attorney of Worcester County at the time he represented the defendant.
            [13] The United States Supreme Court has not defined what it means for a conflict to adversely affect an attorney's performance, although it is clear that "the adverse effect need not rise to the level of actual prejudice."  Commonwealth v. Hodge, 386 Mass. 165, 169 (1982).  See Strickland v. Washington, 466 U.S. 668, 692 (1984) ("prejudice is presumed when counsel is burdened by an actual conflict of interest").  Several Federal circuit courts have adopted a two-part test to determine adverse effect, requiring the defendant to show that "some plausible alternative defense strategy or tactic might have been pursued" and that "the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests."  United States v. Fahey, 769 F.2d 829, 836 (1st Cir. 1985).  Accord United States v. Wells, 394 F.3d 725, 733 (9th Cir. 2005); United States v. Levy, 25 F.3d 146, 157 (2nd Cir. 1994); United States v. Bowie, 892 F.2d 1494, 1500 (10th Cir. 1990); United States v. Gambino, 864 F.2d 1064, 1070-1071 (3d Cir. 1988), cert. denied, 492 U.S. 906 (1989).  Others require the defendant to show also that the forgone defense was objectively reasonable.  See, e.g., Morelos v. United States, 709 F.3d 1246, 1252 (8th Cir. 2013); United States v. Nicholson, 611 F.3d 191, 197, 206-207 (4th Cir. 2010); McFarland v. Yukins, 356 F.3d 688, 706 (6th Cir. 2004); Freund v. Butterworth, 165 F.3d 839, 860 (11th Cir.), cert. denied, 528 U.S. 817 (1999).
            [14] See, e.g., United States v. Daniells, 79 F.4th 57, 88 (1st Cir. 2023) (counsel's improper communications with witnesses gave rise to actual conflict because of his interest in "avoiding government action against himself"); United States v. White, 706 F.2d 506, 509 (5th Cir. 1983) (counsel's involvement in defendant's escape from jail created actual conflict because he "might have conducted the defense with the primary motivation of distancing himself from the defendant and the events surrounding the escape"); Fortson v. United States, 979 A.2d 643, 651-652 (D.C. 2009) (government's allegations that counsel participated in jury tampering created actual conflict).
            [15] Under the Sixth Amendment, a trial court is obligated to initiate an inquiry if it "knows or reasonably should know that a particular conflict exists."  Cuyler, 446 U.S. at 347.  See Holloway v. Arkansas, 435 U.S. 475, 484 (1978).  Although the defendant does not argue that the second judge should have investigated the prosecutor's allegations further at the pretrial hearing, we believe that this would have been the more prudent course.  The second judge could then have conducted a colloquy with the defendant to ensure that he understood the nature and implications of the conflict.  See Martinez, 425 Mass. at 392-393.  The prosecutor could also have moved to disqualify trial counsel, which likely would have triggered a colloquy.  Cf. Brown, 494 Mass. at 331.